Peter J. McQuillan, J.
I
On January 3, 1975, at about 1:00 p.m., three men, wearing ski masks, entered the Chase Manhattan Bank on the southwest corner of 16th Street and 3rd Avenue and announced a stickup. Several bank employees instinctively pushed a holdup-in-progress button, activating a silent alarm as well as a camera positioned over the front door that graphically recorded the animated movements of the perpetrators.
Defendant, part of the trio of thieves, promptly disarmed the bank guard of his revolver. His confederate menacingly *380 held an elderly customer as hostage while the third thug scurried behind the teller’s counter and swiftly stuffed some $20,000 into a small suitcase.
Several pedestrians on the sidewalk observed the robbery taking place within this relatively small branch bank. Their excited screams attracted the attention of off-duty Police Officer Michael McConnon who, with a companion, was walking to a nearby restaurant for lunch. Assigned to the 13th Precinct on East 21st Street, Officer McConnon was scheduled to begin his eight-hour tour of duty that day at 4:00 p.m.
Racing into the beseiged bank with drawn gun as the depraved brigands were about to leave the premises with their pillage, McConnon displayed his silver shield and shouted that he was a police officer. In the small foyer area, he immediately seized the thief who was carrying the loot.
Inside the bank itself, next to the all-glass door, stood defendant, armed with the guard’s revolver and "Molotov cocktails.” Photographs developed from the film in the activated camera show defendant, at this point, approaching the door with the revolver in a raised, cocked position. The incendiary devices had been placed on a nearby counter.
Gunshots were then exchanged between defendant and McConnon; the latter fell to the foyer floor with a mortal wound over the left eye. Defendant, shot in the right shoulder by Officer McConnon (a second shot by McConnon bruised defendant’s left shoulder), dropped the lethal revolver, and, with his confederates slightly ahead of him, ran rapidly from the bank, proceeding west on 16th Street.
Unknown to the robbers at the time they entered the bank, a police officer, in civilian clothes, was waiting in line to cash his salary check. When the terrorists fled after the fatal shooting, this officer followed in fresh pursuit. He captured defendant one block west of Third Avenue. (The lethal revolver, recovered and examined at the crime scene by forensic technicians and subsequently tested by ballistics experts, was stolen from the District Attorney’s office just prior to the commencement of defendant’s trial. It has not yet been recovered. It was stipulated by the prosecutor that defendant has no implication whatsoever in this theft.)
The other two robbers fled the area. One was wearing an Army overcoat with a shoulder insignia. (They were subsequently arrested and are awaiting trial. Two months after this crime, the bank guard, still then on duty at the same prem *381 ises, was sordidly shot and ineffably injured by another and unrelated team of armed robbers. He is tragically and painfully paralyzed. A pretrial conditional examination of this witness was conducted at the Rusk Institute of Rehabilitation Medicine.)
The first officers responding to the holdup were members of the emergency service division. They promptly placed McConnon on a stretcher and began to carry him to their van. A passing photographer fortuitously took a picture of this event: the photo clearly shows McConnon’s silver shield dangling on a chain from the stretcher. The wounded officer was taken to Bellevue Hospital. He died at 1:45 p.m.
Defendant was taken to the 13th Precinct, briefly questioned and made inculpatory statements that he claims were involuntary and which he sought to suppress. At about 2:00 p.m. defendant was then taken to Bellevue Hospital for treatment of the shoulder wound. Later in the day, police officers seized certain physical evidence from defendant’s apartment on West 22nd Street. Defendant, claiming that the search violated his Fourth Amendment rights, sought to suppress this evidence.
On May 3, 1976, defendant was convicted by jury verdict of the crimes of murder in the first degree and murder in the second degree (felony murder). He is awaiting sentence. Prior to trial, defendant, pursuant to CPL article 710, made a motion to suppress the physical evidence and the alleged statements. A hearing was conducted on March 31 and April 1, 1976.
Six witnesses testified at the hearing: Detectives John J. Stein, Joseph Gannon, Peter J. Bombara, Sergeant John J. Ulsamer, FBI Special Agent Stephen M. Carbone, and Dr. Gene S. Rosenberg. The testimony of these witnesses, marked by no serious inconsistencies or contradictions, had the force and flavor of credibility.
At the conclusion of the hearing, I denied defendant’s motion. I found beyond a reasonable doubt that defendant’s statements were voluntarily made and that there was no illegal search and seizure. Nothing that the police did in this case can be said to offend those values that are at the core of the Fourth and Fifth Amendments. I stated that I would subsequently file the required findings of fact and conclusions of law (CPL 710.60, subd 6). This memorandum incorporates such findings and conclusions.
*382 FINDINGS OF FACT
Shortly after 1:00 p.m. on January 3, 1975, Detectives Stein and Gannon, members of the major case squad, were informed by radio of the Chase Manhattan robbery. They drove to the bank, spoke with other officers at the scene, and learned that a police officer had been shot and that a suspect was in custody at the 13th Precinct station house.
They arrived at the precinct house at about 1:15 p.m. and were informed that the suspect was wounded in the upper arm and that an ambulance had been summoned. Detective Stein introduced himself to defendant. He was the first law enforcement officer to question defendant about the robbery that occurred minutes earlier. The interview was conducted in a room on the second floor. Stein testified as follows: "When I entered the room he was standing erect, his hands were cuffed behind him, they were released. He walked with a steady gait into the room, seated himself, removed his jacket. He answered in a clear voice, his eyes * * * were very wide, his pupils seemed to be widely dilated. He was heavily perspired * * * I said to him you realize you are in a great deal of trouble, that you have stuck up the bank and he said, yes, and then I said to him let me advise you of your constitutional rights. I said to him, you have a right to remain silent, anything you say can and will be used against you in a court of law. Do you understand that? He said, yes, he did. I then * * * asked him, do you have a lawyer and he indicated by shaking his head no. I then said to him, if you don’t have a lawyer the state will provide you with a lawyer. Do you understand that? He said he did. I then told him that he had a right to consult with a lawyer before making any other statements. I asked him if he understood it. He said he did. I then asked him if he cared to answer my questions and he said he would.”
Defendant then told Stein and Gannon that he went to the bank with Freddie Ruiz from Brooklyn and Tony from New Jersey. Stein asked defendant "who shot the man in the bank,” and he replied, "I did.”
Defendant asked for a glass of water and a cigarette; he said that he was thirsty; that he had done a lot of running; and that he had sustained an injury to his right arm. Stein left the room to get the requested items for defendant. While outside, he learned that McConnon had just died. He returned to the room and handed the water and cigarette to defendant. *383 Stein was then directed by a supervisor to pursue other facets of the investigation. He never mentioned to defendant that a police officer had been the victim of the shooting.
Defendant did not complain to Stein of his injury. Stein observed blood on defendant’s shirt "but the wound itself when he displayed it was no longer bleeding.” Stein described it as "a superficial skin wound.” Stein was unaware that defendant had on his person a lawyer’s business card containing the name of an attorney employed by the Legal Aid Society. At no time during the very brief period that defendant was in police custody did he request an attorney or display the card to a law enforcement officer or decline to be questioned or refuse to respond to the interrogation.
Detective Gannon was present when Stein gave defendant the Miranda admonitions. After Stein left to assume another assignment, Gannon continued the interrogation. (At this point Detective Bombara and Agent Carbone entered the room.) Gannon testified as follows: "I asked Velez if he would start from the original point when they first anticipated the robbery and Velez indicated to me that some time on January 2nd around 11 p.m. to some time around 1 a.m. of the 3rd that he, Velez, Freddie Ruiz and Tony walked over to the bank. They looked into the bank to observe inside the bank and at one point Freddie made an indication to a bank surveillance camera. Make sure you stay away from * * * the camera. Then they went back to Velez’ apartment, at which time they drew several diagrams, and who was going to take what position, and how they would participate in the robbery * * * Freddie Ruiz was to go behind the teller’s counter and remove the cash from the cash drawers. Tony was to grab a customer. And Velez was to grab the guard and disarm the guard of his weapon. And at this point, those other individuals had entered the room. And knowing that it was now a homicide investigation, that’s the point that I stopped my interview.”
Defendant also told Gannon that after the robbery "they would meet at Ruiz’ aunt’s house somewhere in Brooklyn.” Gannon’s interview with defendant lasted about 10 minutes. Gannon left the room to brief the assistant director of the FBI who had just arrived at the precinct. Defendant remained in the room with Bombara and Carbone. During the interview, Gannon observed a very small amount of blood on defendant’s outer clothing. He said that defendant’s "general appearance appeared normal.” A short time later Gannon accompanied *384 defendant to the hospital in a police vehicle. He said that defendant had no trouble in walking.
Carbone introduced himself to defendant as an FBI agent: "I advised him that I was there to interview him concerning the bank robbery of the Chase Manhattan Bank * * * that same day, and that before I asked him any questions, I would like to advise him of his rights, and at that time I read from this form * * * Then I asked him if he understood these rights. He stated he did. I gave him this form and asked him to read the form and he said that he could read * * * He read the form, said he understood it. I asked him would he sign the form * * * At that time he told me he could not sign the form because he had a wound in his arm * * * I was somewhat surprised when he told me that * * * I asked him * * * would he be willing to speak to me. He said he would. Then I questioned him about the bank robbery.”
Defendant then gave some details of the crime: "he disarmed the guard in the bank by using a knife. He took the guard’s gun. He then said that while he was in the bank he heard police and he turned and he said that he thinks he fired the gun. He also said that that was the last he could recall about what happened in the bank.” Defendant also told Car-bone that after the robbery they were to meet at Ruiz’ aunt’s house near the Broadway elevated line in Brooklyn. He said that Ruiz was a Hispanic male, about 6 feet 4 inches tall, 185 pounds, and that Tony was a Negro male, about 25 years old, 5 feet 11 inches tall with processed hair. Defendant gave his home address as 424 West 22nd Street, apartment 9.
Carbone’s interview with defendant lasted approximately 15 minutes. He said that defendant "seemed to be alert, attentive to my questions.” He did not inform defendant that a police officer had been shot. When Carbone left the room, several police officers remained with defendant.
Detective Bombara testified that members of the homicide squad are responsible for the investigation of any incident in which a police officer is shot. He said that when he began to interview defendant, he was not aware that McConnon had died. Bombara identified himself to defendant and said that he was assigned to the homicide squad. He advised defendant of his Miranda rights and the latter replied that he was willing to answer the detective’s questions.
When Bombara began his interrogation, another police officer came into the room and told Bombara that they knew *385 defendant’s home address. Bombara was told to ask defendant "if he would give us the keys to his apartment, so I posed the question to Mr. Velez and he gladly turned over the keys to us to his apartment * * * I don’t recall whether he went into his pocket or they were on the desk.” At this point in Bombara’s interrogation, the police were seeking to capture defendant’s two confederates who had fled the area. Defendant at this time gave his address as apartment 9, 434 West 22nd Street. Subsequent events, a short while later, revealed defendant’s residence to be apartment 9, 424 West 22nd Street.
When the interview started, Bombara was unaware that defendant had been shot. He learned that defendant was wounded when an ambulance attendant appeared in the interrogation room. He said that defendant did not appear to be injured or hurt: "he moved his hands freely and was talking to me in a very nice tone, véry nice manner. No problem with him * * * He was respectful, spoke clearly, responded, very cooperative.” At about 2:00 p.m., Bombara took defendant to Bellevue Hospital. There, physicians informed Bombara that he could not interview defendant since they were preparing to treat him.
Later the same day, at 8:40 p.m., Bombara swore to an affidavit for a search warrant authorizing a search of defendant’s apartment at 424 West 22nd Street. This application corroborated the principal application submitted by Sgt. Ulsamer (discussed, infra). Both applications were prepared by an Assistant District Attorney.
Dr. Rosenberg was a first-year resident on the trauma surgery service at Bellevue on January 3, 1975. He initially examined defendant at 2:30 p.m. He found that defendant’s right arm "was pretty much paralyzed.” He expressed the opinion that the paralysis occurred at the time of the wound. He found that a bullet had entered the lateral side of the right shoulder and had come to lie subcutaneously in the armpit: "very superficial, just underneath the skin.” It was palpable on physical examination. He described the entrance wound as "a small abbreviated-looking wound * * * [it] was a very neat round little hole which was not bleeding.” In addition, there was a superficial abrasion to the left shoulder.
Defendant was able to relate to Dr. Rosenberg the dates on which he had been hospitalized in the past; the fact that he was a diabetic; how much insulin he took; the fact that he was on methadone maintenance and what his dosage was. The *386 latter information, upon a later verification, was found to be accurate.
Defendant told Dr. Rosenberg that he was in considerable pain, and unable to move his arm. "I simply did a sensory exam, asking him if he could feel a pin-prick or pinch down in his arm * * * In various places he was. In various places he was not.” The doctor found that defendant’s pain was minimized when the arm was held motionless.
The doctor testified that defendant "was able to give me direct simple answers to my direct simple questions. He had a good pulse, a good blood pressure. He was oriented. He knew I was a physician. And he was able to answer all the various questions that I asked * * * He seemed to be oriented * * * his main problem was his gunshot wound * * * He seemed to be very quiet. He was a small fellow who was laying there very passively in bed, and he was coherent. He gave very brief replies to my questions. He was not at all conversational. In fact, just the opposite. He was very withdrawn”.
Dr. Rosenberg testified that at one point during the examination, defendant "asked me a rhetorical question, phrased approximately as: this person approached him with a gun in hand and was firing bullets and he was the lookout for the robbery, and that what did he expect somebody to do, he had a gun to protect himself, and this fellow was shooting bullets at him, and therefore he shot to protect himself.” Defendant told the doctor that "this fellow fired at him first * * * obviously trying to shoot him and he responded in kind and it happened that * * * his aim was better and he asked me what I would do in that situation and how was he supposed to know this fellow was a police officer.” Dr. Rosenberg testified, "I really had no way to answer that.”
Dr. Rosenberg found nothing to indicate that defendant’s mental ability was impaired: "he answered me clearly and concisely * * * his speech was clear.” He expressed the opinion that defendant’s physical condition was better at 1:30 p.m. than at 2:30 p.m. when he first saw him: "I would say his condition was probably better. At the time he came in, his blood sugar was 900, probably as a result of the stress and gunshot wound. And I would venture to say probably an hour earlier it was not that high. Might have been closer to normal.”
Dr. Rosenberg said that a blood sugar of 900 is at a dangerously high level, since the normal is usually 120. He expressed *387 the opinion that among the factors that can raise the sugar level of the blood are infections, stress from a gunshot wound and physical stress such as running. With respect to the defendant, he said that it "is hard to say what factor is most important, be it the gunshot wound, be it the fact that he had been chased, the fact that he was extremely excited by the situation which he was involved in. I think they all probably contributed; in my own mind, I attribute more significance to the gunshot wound * * * This particular patient seemed to give me very coherent information * * * and he was able to converse with me very coherently. So I was somewhat in fact surprised to see that the sugar was as high as it was because it did not seem to be in completely keeping with the mental status that I found him in.”
Sgt. Ulsamer arrived at the scene of the bank robbery moments after Officer McConnon was shot. He observed Mc-Connon being placed in the emergency service van, and he followed this vehicle to Bellevue Hospital. He remained at the hospital until 1:45 p.m. when McConnon died. He then returned to the 13th Precinct. He never interviewed defendant.
At about 2:00 p.m., a superior directed him to go to apartment 9 at 434 West 22nd Street for the purpose of arresting the two other perpetrators of the bank robbery. (This was the address defendant gave as his residence moments earlier to Bombara, as well as the place where defendant said that the bank robbery had been planned the night before.) Sgt. Ulsamer was accompanied by three other police officers and two FBI agents. They were armed with shotguns. Ulsamer had a description of the two perpetrators, including the clothing worn by them.
When they arrived at 434 West 22nd Street they discovered that it was a one-family brownstone dwelling. After the occupant consented to their entry, it was evident that it was not defendant’s residence. Ulsamer immediately telephoned his supervisor at the 13th Precinct. He was informed that a set of keys to the suspect apartment would be sent over to him.
Moments later, a police officer from the station house arrived at West 22nd Street with the keys Bombara had just received from defendant. Ulsamer was told that one key would open the front entrance door to the building and another key would open defendant’s apartment door.
Ulsamer then proceeded to insert the key into the front entrance door lock of various buildings along West 22nd *388 Street. Near the east end of the street he suddenly observed an Army overcoat with an insignia on one shoulder, as well as three gloves, in a garbage can in front of 426 West 22nd Street. (Ulsamer had previously learned that one of the perpetrators was wearing an Army overcoat with an insignia on one arm.) He then inserted the key in the front door lock of No. 426. It did not fit. He then went to No. 424, and the key opened the front entrance door to this building.
Ulsamer and an FBI agent proceeded to apartment 9 on the top floor. The other officers were strategically deployed. Using a key, Ulsamer opened the door. He made no announcement of his identity or purpose. He and the agent entered the small apartment. They found the premises unoccupied.
In the middle of the large room, Ulsamer observed on a coffee table a steno pad opened to a page containing what appeared to be a floor plan of a bank, e.g., he noticed the word "camera.” He did not touch this item.
Ulsamer and the agent left the apartment and locked the door. Two officers were instructed to stand guard "and to allow no one to enter the apartment.” At some time after 3:00 p.m., Ulsamer went to the District Attorney’s office where an application for a search warrant was prepared.
Ulsamer and Bombara later appeared before a Judge of the Criminal Court with a search warrant application. The warrant was issued at 8:40 p.m. They arrived back at apartment 9 at 8:50 p.m. and entered the apartment by use of the same key. Inside, while executing the search warrant, Ulsamer seized the items sought to be suppressed, viz., the steno pad (containing the bank floor plan) initially observed in plain view some six hours earlier, and a "stickup note” intended for a bank teller which was found apparently discarded in a kitchen garbage can. Sgt. Ulsamer and the other officers left the apartment at 11:30 p.m. The search warrant did not contain a "night time” search authorization (CPL 690.30, subd 2; 690.35, subd 3; 690.45, subd 5).
CONCLUSIONS OF LAW
Defendant seeks to suppress the various statements allegedly made to law enforcement officials during custodial interrogation on the ground that such statements were "involuntarily made” (CPL 60.45).
I find beyond a reasonable doubt that each law enforcement *389 official who interrogated defendant fully and carefully complied with the specific protective guidelines prescribed by Miranda, i.e., each official imparted to defendant a clear understandable warning of all his rights. There was no necessity for Detective Gannon to repeat the Miranda warnings given defendant in his presence moments before by Detective Stein. The repetition of the admonitions by Detective Bombara and Agent Carbone provided added assurance that defendant was made fully aware of his right to remain silent and his right to counsel.
Defendant orally acknowledged to each interrogating officer that he understood the Miranda warnings. The repetition of the required admonitions simply reminded defendant again that he could remain silent and could consult with a lawyer. He was carefully given a full and fair opportunity to exercise these options.
I find beyond a reasonable doubt that defendant knowingly, intelligently and expressly waived his Miranda rights, and voluntarily made the various statements sought to be suppressed. There is nothing in the record that remotely suggests that this waiver was suspect, unknowing or unintelligent. The evidence is to the contrary.
There is a complete absence of coercive or oppressive official conduct. There was no official subterfuge or misrepresentation. Defendant was not subjected to lengthy or harassing questioning. Indeed, the complete interrogation period was less than one hour from the time of the shooting itself until the questioning ceased.
Defendant’s diabetic condition and the relatively minor shoulder wound did not impair his ability to appreciate and understand his Miranda rights, nor did his physical condition impair his capacity to effectively waive such rights. The waiver was a reasoned and deliberate act by defendant.
His confessions to the police investigators were the product of a "rational intellect and a free will.” Defendant was composed and in full control when he made the statements sought to be suppressed.
There is no evidence that defendant’s ability to make a free and rational choice was impaired. He was alert and responsive and possessed sufficient cognitive capacity and volitional competency.
In brief, I find beyond a reasonable doubt that defendant *390 was adequately informed of his Miranda rights, understood them, and knowingly, voluntarily, and intelligently elected to waive them.
Defendant, claiming also to be aggrieved by an unlawful search and seizure, moved for the suppression of a steno pad and a "stickup note” taken from his apartment on the night of January 3 pursuant to a search warrant issued at 8:40 p.m. The warrant did not authorize execution thereof between 9:00 p.m. and 6:00 a.m. The executing officer entered the described premises at 8:50 p.m. and immediately seized the steno pad. The note was seized after 9:00 p.m.
Defendant argues that Sgt. Ulsamer had no probable cause or other authority to make a warrantless and unannounced entry into his home during the early afternoon of that day; that because of this illegal trespass the "plain view” doctrine is inapplicable; and that the subsequent search warrant is tainted by the initial trespass. Defendant additionally argues that the police had no statutory authorization to seize the note since this item of evidence was found during a search of the apartment that was conducted after 9:00 p.m.
Defendant’s arguments are without merit. There were no Fourth Amendment violations in this case. Sgt. Ulsamer had much more than a personal intuition or insubstantial guess when he initially entered defendant’s home. The basis for his warrantless emergency action was articulated at the pretrial hearing for the court’s objective scrutiny. The People’s evidence abundantly demonstrated specific and articulable facts which, taken together with rational inferences from those facts, reasonably warranted the police action taken in this case.
These are the unambiguous, incriminating, raw facts known to the officers who, immediately after the shooting, were in pursuit of the two fleeing felons: (1) the police knew the names and descriptions of the two unapprehended and armed bank robbers; (2) they knew that the three conspirators had carefully planned the robbery in defendant’s apartment the night before; (3) they knew the location of defendant’s apartment: it was less than a mile from the victimized bank; (4) they had the keys to defendant’s apartment and the front entrance door of his building; (5) within one hour after the shooting they observed an unusual garment discarded in a garbage can adjacent defendant’s home; this unique garment was strikingly similar to one worn a short time before and a short *391 distance away by one of the bandits. It was reasonable for Ulsamer to infer that the fugitives might be in defendant’s apartment. (In fact, as developed at trial, they fled to a friend’s apartment adjacent defendant’s building.)
It defies reason to argue that the police could not make a warrantless and unannounced entry of defendant’s apartment for the sole purpose of searching for and effecting the arrest of two dangerous and armed robbers who had just perpetrated a felony murder. Sgt. Ulsamer had ample probable cause and justification to enter the apartment to flush out the fugitives.
At that moment, the facts and circumstances within his knowledge and of which he had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the two fleeing fugitives were in defendant’s apartment. There was a substantial, concrete basis for Ulsamer’s belief.
This is not a case involving arbitrary or harassing resort to the police power, or a blatant disregard of defendant’s right to privacy. The police were fully justified in entering apartment 9 and conducting the limited search undertaken.
Under the compelling circumstances of this case, the exigencies of the situation made that course imperative. The physical scope of a warrantless search must be justified by the attendant circumstances that rendered its initiation permissible. The scope of the search, its intensity, and the objectives sought are the crucial factors in determining the reasonableness of a police intrusion into a person’s home. There is no universal test for determining reasonableness other than by balancing the need to search against the invasion which the search implicates.
The officers in this case acted reasonably when they entered apartment 9 to search for the other bank robbers who, under the attendant circumstances, were reasonably believed to be within the apartment. There is no requirement that the police had to be certain that the fugitives were in the apartment. There is a substantial difference between probable cause and proof beyond a reasonable doubt, and a like difference in the quality and quantity of evidence required to establish them. The broadest scope should be given to a police officer in the field to use all lawfully acquired information in aid of his decision to take prompt emergency action required by the inherent necessities of some critical situation.
The Fourth Amendment does not require the police to delay their investigation in such an emergency setting. Speed here *392 was obviously essential. The police explanation for the warrantless entry patently was not pretextual. The failure to follow the warrant requirements of the Fourth Amendment was excusable under the facts here. It was simply impracticable to obtain advance judicial approval to enter apartment 9 to search for the fugitives. It would be foolhardy and dangerous to require the police to ignore what they knew and saw until they obtained a search warrant, which would have taken, at best, several hours.
On April 6, 1976, the Court of Appeals, in People v Mitchell (39 NY2d 173, 179, 180), noted "that reasonableness is the benchmark of the Fourth Amendment proscription against warrantless searches and seizures * * * The reasonableness of police activity must always pass judicial muster according to objective, empirical criteria before the court * * * Constitutional guarantees of privacy and sanctions against their transgression do not exist in a vacuum but must yield to paramount concerns for human life and the legitimate need of society to protect and preserve life * * * The United States Supreme Court has stated that '[t]he Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others’ (Warden v Hayden, 387 US 294, 298-299).”
The item of evidence initially and inadvertently observed by Ulsamer was in plain view. That which is in plain view is not the product of a search. The plain view doctrine applies to a case, such as this, where a police officer is not searching for evidence against the defendant, but nonetheless inadvertently comes across an incriminating item provided, as in this case, the officer had a prior justification to be where he was.
The primary purpose of the Fourth Amendment is to prevent unreasonable invasions of the security of the people in their persons, houses, papers and effects. The amendment does not proscribe per se all warrantless searches. It proscribes unreasonable searches. A warrantless search is not necessarily always unreasonable. When an officer has reasonable cause to enter a dwelling in hot pursuit of two dangerous fugitives, his entry is not unreasonable. Compliance with the announcement mandate is not required if the officer’s peril would have been increased or the prospective arrest frustrated had he demanded entrance and stated his purpose. Here, justification for Sgt. Ulsamer’s failure to give notice is uniquely present.
Sgt. Ulsamer acted properly and cautiously in leaving the *393 apartment once he determined that the two fugitives, in fact, were not in the premises. The affidavit he subsequently submitted to a Criminal Court Judge spelled out abundant probable cause.
Ulsamer entered the apartment before 9:00 p.m. to execute the search warrant v^hich was in proper form. The search actually commenced before 9:00 p.m. The fact that one item of evidence was found and seized after 9:00 p.m. does not vitiate the validity of the warrant and the concomitant search and seizure. There was substantial compliance with CPL article 690.
Defendant’s motion to suppress physical evidence and statements is denied in all respects.
II
Defendant has been convicted by jury verdict of the class AI felony of murder in the first degree (Penal Law, § 125.27; added by L 1974, ch 367, § 5, eff Sept. 1, 1974), and the class A-I felony of murder in the second degree (Penal Law, § 125.25, subd 3). As noted earlier, defendant is presently awaiting sentence. Section 60.06 of the Penal Law (added by L 1974, ch 367, § 2) provides that when a defendant is convicted of murder in the first degree (as defined in § 125.27), "the court shall sentence the defendant to death,” i.e., the Trial Judge must, without exception, inexorably impose a death sentence upon a defendant convicted of the offense defined in section 125.27.
Defendant has made a motion for an order declaring the mandatory death penalty prescribed by section 60.06 unconstitutional as violative of the Eighth and Fourteenth Amendments to the United States Constitution and of section 5 of article I of the New York State Constitution. In support of his motion, defendant relies on Gregg v Georgia (428 US 153); Proffitt v Florida (428 US 242); Jurek v Texas (428 US 262); Woodson v North Carolina (428 US 280); Roberts v Louisiana (428 US 325). These decisions were announced on July 2 and 6, 1976, two months after the defendant was convicted by jury verdict.
The opinions reported in these cases reveal that seven Justices concluded that the death penalty for murder does not constitute a per se violation of the Eighth Amendment. Five Justices agreed that a statutory scheme that makes the impo *394 sition of the death penalty mandatory for a defendant convicted of a first-degree murder violates the Eighth Amendment.
On July 22, 1976, Mr. Justice Powell entered an order staying the issuance of the mandates in the Gregg, Jurek and Proffitt cases pending determination of a petition for a rehearing. On October 4, 1976, the United States Supreme Court denied the petition for a rehearing, and vacated the prior order entered by Mr. Justice Powell (20 Cr L 4019).
Since every State statute is presumptively valid, a trial court must act with extraordinary constraint and extreme caution before declaring an act of the Legislature unconstitutional. Indeed, a trial court, whenever possible, must construe a statute in a manner that avoids a declaration of invalidity; i.e., every Judge has a duty to strive to adopt that construction of a contested statute that preserves its constitutionality.
A statute may be found in conflict with the Constitution only when such finding is patently apparent. This is a cardinal principle of statutory construction. Thus, if a trial court has some doubt or uncertainty as to the validity of a statute, the court must uphold and apply the law; i.e., a doubt must be resolved in favor of the statute’s constitutionality. A judicial declaration of invalidity may be made by a trial court only when such construction is ineluctably inescapable. Such declaration should rarely be made and only in a case involving life and liberty; when made, it must always be from a position of principled neutrality or reasoned principle.
Judicial self-restraint and due deference for the separation of powers doctrine prevent a trial court from passing on the wisdom of a death penalty statute. Indeed, a Judge’s intuitive sense that capital punishment shocks the conscience because of its severity and finality, or a Judge’s personal views on the compelling pragmatic necessity for or the utter irrationality of capital punishment, are irrelevant when the court is confronted with the grave issue of the constitutionality of that type of sanction; i.e., visceral jurisprudence has no place in this area.
"We should not allow our personal preferences as to the wisdom of legislative * * * action, or our distaste for such action, to guide our judicial decision in cases such as these. The temptations to cross that policy line are very great” (Furman v Georgia, 408 US 238, 411, Blackmun, J., dissenting). A Judge, on the other hand, may not use the doctrine of *395 judicial self-restraint as a cover to avoid his or her sworn obligation to enforce the Constitution.
That a court may believe the Legislature is mistaken when it enacts a death penalty law does not at all lessen the broad power of the Legislature to proscribe conduct as criminal and to determine that execution serves a more effective societal purpose than life imprisonment. But a court does possess the power to strike down a death penalty statute that clearly violates a constitutional limitation. "[T]he Constitution of this state confers power upon the courts to declare void legislative acts prescribing punishments for crime, in fact cruel and unusual” (People ex rel. Kemmler v Durston, 119 NY 569, 577, affd 136 US 436). "Thus, the final judgment as to whether a punishment exceeds constitutional limitations is properly a judicial function” (People v Broadie, 37 NY 2d 100, 124).
No Judge must ever hesitate to act when a statute’s constitutional invalidity is apparent beyond a reasonable doubt. An independent judiciary must never fear disapproval when it makes a decision or issues an opinion that it firmly believes is in accord with the commands of the Constitution.
In its July, 1976 decisions, the United States Supreme Court held "that in capital cases it is constitutionally required that the sentencing authority have information sufficient to enable it to consider the character and individual circumstances of a defendant prior to imposition of a death sentence” (Gregg v Georgia, 428 US 153, 189-190, n 38, supra). Section 60.06 of the Penal Law unequivocally precludes this critically essential consideration. It is, accordingly, at fatal variance with the Eighth Amendment.
In Gregg (supra), the plurality stated that "the concerns expressed in Furman that the penalty of death not be imposed in an arbitrary or capricious manner can be met by a carefully drafted statute that ensures that the sentencing authority is given adequate information and guidance. As a general proposition these concerns are best met by a system that provides for a bifurcated proceeding at which the sentencing authority is apprised of the information relevant to the imposition of sentence and provided with standards to guide its use of the information” (p 195).
Section 60.06 of the Penal Law unmistakably precludes a bifurcated trial. This was a knowing and purposeful decision made by the Legislature at its 1974 session. "We do not pause to consider whether a statute differently conceived and framed *396 would yield results more consonant with [the Constitution] * * * We take the statute as we find it” (Anderson v Wilson, 289 US 20, 27).
I find beyond a reasonable doubt that the imposition and carrying out of the mandatory death penalty sentence in this case would constitute cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments of the United States Constitution. Accordingly, I declare section 60.06 of the Penal Law unconstitutional. Defendant, however, shall be sentenced to life imprisonment in the manner prescribed by law (Penal Law, § 60.05, subd 1; § 70.00, subd 2, par [a]; subd 3, par [a], cl [i]). In view of this decision, no determination need be made on the question of whether vel non the death penalty is presently a permissible penal sanction under the State Constitution (cf. People v Anderson, 6 Cal 3d 628, cert den 406 US 958).
A.
The revised Penal Law, when it took effect on September 1, 1967, provided for the death penalty in certain murder cases (L 1967, ch 791; see Legis Doc [1963], No. 8, pp 13-16, 53-59; Legis Doc [1965], No. 25, pp 63-121; L 1963, ch 994; L 1965, ch 321; L 1966, ch 66; L 1968, ch 949; L 1971, ch 1205; L 1973, chs 276, 278). Following conviction for a specified type of murder, a separate "penalty trial” was conducted. At this second stage of the bifurcated criminal action, either party could present evidence on any matter relevant to sentence including, but not limited to, the nature and circumstances of the crime, defendant’s background and history, and any aggravating or mitigating circumstances (L 1967, ch 791, § 11). The sentence of death was at the unbridled discretion of a unanimous jury.
In June, 1972, in Furman v Georgia (408 US 238), supra by a 5-4 vote, the United States Supreme Court invalidated capital punishment as imposed in the cases then under review. Each Justice authored a separate opinion. Together, these opinions comprise 230 pages of the official reports. The Chief Justice, in his dissent, observed that the actual scope of the court’s ruling (p 397) "is not entirely clear,” and that (p 403) "the future of capital punishment in this country has been left in an uncertain limbo.”
On June 7, 1973, in People v Fitzpatrick (32 NY2d 499, 509-513, cert den 414 US 1033), the New York Court of Appeals *397 was called upon to say whether the then death penalty scheme in New York, supra, constituted cruel and unusual punishment within the intendment of the Eighth Amendment, as interpreted by the Supreme Court in Furman.
With respect to the standardless jury discretion scheme invalidated by Fitzpatrick, see Gregg v Georgia (428 US 153, 195-196, n 47, supra), "we adhere to Furman is determination that where the ultimate punishment of death is at issue a system of standardless jury discretion violates the Eighth and Fourteenth Amendments”.
On June 20, 1973, Governor Rockefeller issued the following statement: "I am deeply concerned that the deterrent provided by the death penalty for the murder of peace officers * * * has been undermined by a recent decision of the State Court of Appeals which in effect nullified this State law. In the interests of deterring such crimes, it is vital that the death penalty be retained in such cases. This decision was based on an interpretation by the State Court of Appeals of a U. S. Supreme Court decision, holding that the discretion permitted under State law as to application of the death penalty rendered it a cruel and unusual punishment. I have been advised that the issue arising from the Court of Appeals decision is expected to be carried on appeal to the U. S. Supreme Court. If the Nation’s highest court reverses the Appeals Court decision, no further action will be necessary. If, however, the Supreme Court upholds the State Court, I plan to offer legislation at the next session of the Legislature which would eliminate the discretionary nature of the death penalty and thus restore the penalty as to the murder of peace officers and prison guards.”
See Oelsner, Governor to Seek Death Sentences, The New York Times, June 21, 1973: "In his statement yesterday, the Governor did not specify what form his legislation would take. All he said was that it would 'eliminate the discretionary nature of the death penalty.’ Asked if that meant that death penalties would be mandatory, a press aide said, 'We’ll have to see how the legislation comes out.’ ”
On November 12, 1973, the United States Supreme Court denied certiorari in Fitzpatrick (see Oelsner, State Death Penalty Permanently Voided, The New York Times, Nov. 13, 1973, p 1; see, also, 414 US 1033, 1050). A week later, a commentator made this observation: "Proponents of capital punishment now contend that the capricious quality in the *398 law was the fact that the death penalty was optional. But make it mandatory to execute police murderers and it will pass constitutional muster, they say, as they prepare to launch their campaign next month at a legislative hearing” (Clines, Death Penalty — Seeking a Reprieve in Albany, The New York Times, Nov. 18,1973).
In December, 1973 the Assembly Codes Committee held hearings on death penalty proposals (see NY LJ, Dec. 7, 1973; see The New York Times, Dec. 9, 1973, Hearing is Held on Death Penalty: "[A] number of lawmakers have expressed the view that it was the optional, and therefore inherently arbitrary nature of the death penalty that the courts objected to, and that if capital punishment were mandatory for certain kinds of murder the penalty would be found constitutional * * * Governor Rockefeller has said he would sign a bill making capital punishment mandatory for the murder of peace officers”).
See Antevil, The Death Penalty: A Far From Closed Case, Sunday New York Daily News, Aug. 19, 1973, p 65: "Of great concern to foes of capital punishment is the flurry of new state laws * * * Murder in some form is included in all the new death penalty statutes * * * [Attorneys for the Legal Defense Fund and the ACLU] said the new laws fall into two broad categories: (1) Some of them seek to meet high court complaints about arbitrary imposition by making execution mandatory for specified crimes such as first-degree murder. (2) The majority retain discretion for the judge or jury, but seek to eliminate arbitrariness by setting standards or guidelines to be used in deciding whether to impose the death penalty. Many of these laws follow the approach suggested by the Nixon administration in legislation which is pending before Congress. Under this system, two trials are held: one to determine guilt or innocence and one to decide if certain mitigating or aggravating circumstances were present in the crime. If no mitigating factors are found * * * and if there were any aggravating factors * * * the sentence of death is automatic. A committee of the state attorneys general organization reported last December that it considered 'a mandatory death penalty for specified offenses’ as the alternative most likely to 'withstand constitutional attack’.”
At its 1974 session, the New York Legislature, in response to the unanimous holding in Fitzpatrick, repealed the judicially invalidated death penalty statutes, and enacted the law *399 which is the subject of the present proceedings (see New York Daily News, March 7, 1974, p 92; The New York Times, April 3, 1974; April 24, 1974, p 1; May 1, 1974, p 22). Under this law, following a defendant’s conviction of murder in the first degree, the Trial Judge or the jury may not receive or consider additional evidence in extenuation, mitigation or aggravation of punishment; i.e., any semblance of a discretionary sentence is proscribed.
Following enactment of this 1974 law, New York occupied a unique position in the history of capital punishment in the United States: it was the last State in the Nation to repeal mandatory execution for an intentional murder (in 1963; see Legis Doc [1963], No. 8, p 13), and it was one of the first of the very few States that (post-Furman) reintroduced the concept of a mandatory death penalty.
In July, 1976, a plurality of the Supreme Court, in Woodson (428 US 280, supra), suggested that Furman may not be construed as condemning discretionary sentencing in capital cases. Following Furman, New York and nine other States provided for a mandatory death penalty scheme, while 25 other States (e.g., Georgia, Florida and Texas) rejected a mandatory approach (Note, Discretion and the Constitutionality of the New Death Penalty Statutes, 87 Harv L Rev 1690). This divergence may be attributable to the understandably diverse readings of the nine concurring and dissenting opinions in Furman.
The plurality in Gregg (428 US 153, 179-180, supra) made this observation: "The most marked indication of society’s endorsement of the death penalty for murder is the legislative response to Furman. The legislatures of at least 35 states have enacted new statutes that provide for the death penalty for at least some crimes that result in the death of another person. And the Congress * * * in 1974, enacted a statute providing the death penalty for aircraft piracy that results in death. These recently adopted statutes have attempted to address the concerns expressed by the Court in Furman primarily (i) by specifying the factors to be weighed and the procedures to be followed in deciding when to impose a capital sentence, or (ii) by making the death penalty mandatory for specified crimes”. New York, like North Carolina and a few other States, adopted the latter mandatory approach.
In Woodson (428 US 280, 298-299, supra), the plurality addressed itself to the question of "whether the mandatory *400 statutes adopted by North Carolina and a number of other States following Furman evince a sudden reversal of societal values regarding the imposition of capital punishment. In view of the persistent and unswerving legislative rejection of mandatory death penalty statutes beginning in 1838 and continuing for more than 130 years until Furman, it seems evident that the post-Furman enactments reflect attempts by the States to retain the death penalty in a form consistent with the Constitution, rather than a renewed societal acceptance of mandatory death sentencing. The fact that some States have adopted mandatory measures following Furman while others have legislated standards to guide jury discretion appears attributable to diverse readings of this Court’s multiopinioned decision in that case”.
The Woodson plurality noted that a "separate deficiency of North Carolina’s mandatory death sentence statute is its failure to provide a constitutionally tolerable response to Furman's rejection of unbridled jury discretion in the imposition of capital sentences. Central to the limited holding in Furman was the conviction that the vesting of standardless sentencing power in the jury violated the Eighth and Fourteenth Amendments * * * It is argued that North Carolina has remedied the inadequacies of the death penalty statutes held unconstitutional in Furman by withdrawing all sentencing discretion from juries in capital cases. But when one considers the long and consistent American experience with the death penalty in first-degree murder cases, it becomes evident that mandatory statutes enacted in response to Fur-man have simply papered over the problem of unguided and unchecked jury discretion”.
The Woodson plurality noted another constitutional shortcoming of the North Carolina statute (pp 303-304): "its failure to allow the particularized consideration of relevant aspects of the character and record of each convicted defendant before the imposition upon him of a sentence of death. In Furman, members of the Court acknowledged what cannot fairly be denied — that death is a punishment different from all other sanctions in kind rather than degree * * * A process that accords no significance to relevant facets of the character and record of the individual offender or the circumstances of the particular offense excludes from consideration in fixing the ultimate punishment of death the possibility of compassionate or mitigating factors stemming from the diverse frail *401 ties of humankind. It treats all persons convicted of a designated offense not as uniquely individual human beings, but as members of a faceless, undifferentiated mass to be subjected to the blind infliction of the penalty of death”.
The Woodson plurality observed that (pp 304-305) "[consideration of both the offender and the offense in order to arrive at a just and appropriate sentence has been viewed as a progressive and humanizing development * * * While the prevailing practice of individualizing sentencing determinations generally reflects simply enlightened policy rather than a constitutional imperative, we believe that in capital cases the fundamental respect for humanity underlying the Eighth Amendment * * * requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death. This conclusion rests squarely on the predicate that the penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case”.
B.
The Eighth Amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.” The cruel and unusual punishments clause is fully applicable to each State through the due process clause of the Fourteenth Amendment (Robinson v California, 370 US 660). The clause means more than a prohibition against barbaric or torturous punishment. In Woodson and Roberts (supra), it was construed by the United States Supreme Court — the ultimate arbiter of the meaning of our basic charter — to proscribe a mandatory death sentence inflexibly imposed upon conviction for a specific type of murder. The death penalty for an aggravated form of murder is constitutionally permissible only if the sentence is discretionary and individualized within the framework of clearly prescribed and reasonable guidelines that safeguard against the arbitrary and capricious imposition of the death sentence (Gregg, Proffitt, and Jurek, supra).
*402 The Eighth Amendment does not sanction a sentencing scheme, such as that prescribed by section 60.06 of the Penal Law, that inexorably imposes a death sentence upon every defendant convicted of a capital offense, however narrow the statutory definition of that crime may be. Developing standards of decency in a mature and stable society repudiate an automatic death sentence, however heinous the condemned conduct may be. The constitutional defectiveness of a mandatory death sentencing scheme is not corrected by legislative action that narrows the scope of capital murders to those where the defined attendant circumstances describe certain aggravating factors. Such delimitation is not of controlling constitutional significance.
The plurality opinion in Roberts (428 US 325, 332-334, supra), made this observation: "The history of mandatory death penalty statutes indicates a firm societal view that limiting the scope of capital murder is an inadequate response to the harshness and inflexibility of a mandatory death sentence statute * * * A large group of jurisdictions first responded to the unacceptable severity of the common-law rule of automatic death sentences for all murder convictions by narrowing the definition of capital homicide. Each of these jurisdictions found that approach insufficient and subsequently substituted discretionary sentencing for mandatory death sentences * * * The futility of attempting to solve the problems of mandatory death penalty statutes by narrowing the scope of the capital offense stems from our society’s rejection of the belief that 'every offense in a like legal category calls for an identical punishment without regard to the past life and habits of a particular offender’ * * * [T]he 19th century movement away - from mandatory death sentences was rooted in the recognition that 'individual culpability is not always measured by the category of crime committed’ * * * The constitutional vice of mandatory death sentence statutes — lack of focus on the circumstances of the particular offense and the character and propensities of the offender — is not resolved by Louisiana’s limitation of first-degree murder to various categories of killings * * * [These] narrowly drawn categories of first-degree murder * * * afford no meaningful opportunity for consideration of mitigating factors presented by the circumstances of the particular crime or by the attributes of the individual offender”.
Section 60.06 of the Penal Law is unconstitutional because *403 it does not focus on the character, background and propensities of the convicted defendant. This statutory scheme accords neither the court nor the jury an opportunity to consider and assess any mitigating or aggravating factors respecting the offense or the offender. The variety of possible offenders who might be involved in the crime of murder in the first degree (as defined in § 125.27) underscores the rigidity of New York’s death penalty scheme and its striking similarity to statutes recently declared invalid by the United States Supreme Court and other courts (see Woodson and Roberts, supra; see, also, Neal v Arkansas, 429 US 808; State v Rondeau, — NM —, 19 Cr L 2508. On July 26, 1976, a State Superior Court Judge held the Indiana death penalty law unconstitutional: The New York Times, July 27, 1976; on Oct. 22, 1976, the Delaware Supreme Court ruled that the State’s mandatory capital punishment law was unconstitutional: The New York Times, Oct. 23, 1976, p 14).
"Now that the fundamental question has been resolved, it should be a simple matter for the states to pass or revise capital-punishment laws conforming to the specific standards set by the Supreme Court” (Editorial, Capital Punishment, New York Daily News, July 3, 1976). Compare Editorial, Again the Executioner, The New York Times, October 7, 1976: "The Supreme Court’s action is no less deplorable for having been so widely advocated and so generally expected * * * Society has an unquestioned right to seek to protect itself against violent criminals by devising effective deterrents and by denying them the freedom to strike again. But there is little evidence that capital punishment is a more effective deterrent than long-term incarceration. Given the fallibility of juries and judges, even when acting under the constraints of less capricious laws, the state’s power to kill remains in conflict with humane principle. Virtually all Western industrial nations have eliminated the death penalty * * * The Vatican revoked capital punishment in 1969 * * * Pressure to reopen the death chambers reflects legitimate public anger against the outrages of violent crime. Society is clearly justified in demanding stern and effective judicial action against the killers in its midst; but other options remain to mobilize the criminal justice system in the fight against murder * * * 'The [death] penalty is too final to be controlled by the frailty of human judgment.’ ”
The concept of mandatory sentences (i.e., the negation of *404 reasonable flexibility) has been consistently discredited by any thoughtful and rational observer of a penal system. It is mindless to suppose that some semblance of justice is achieved when a criminal statute prescribes that each and every defendant convicted of a certain legislatively defined crime (cast, of course, in universal terms) must receive an identical sentence without any consideration of the individual’s background and personality or without any consideration of mitigating or aggravating factors attending the commission of the crime itself.
In the determination of a fair and proper sentence, the United States Supreme Court has recognized that "justice generally requires consideration of more than the particular acts by which the crime was committed and that there be taken into account the circumstances of the offense together with the character and propensities of the offender” (Pennsylvania v Ashe, 302 US 51, 55).
Justice Frankfurter, some 30 years ago, made this observation: "Perfection of draftsmanship is as unattainable as demonstrable correctness of judicial reading of legislation. Fit legislation and fair adjudication are attainable. The ultimate reliance of society for the proper fulfilment of both these august functions is to entrust them only to those who are equal to their demands” (Some Reflections on the Reading of Statutes, 47 Col L Rev 527, 546).
Neither a computer nor a skilled legislative draftsman can formulate in words a sentencing structure that hopes to achieve or even resemble fairness and justice unless the courts are accorded reasonable discretion to deal individually and evenhandedly with the wide variety of cases that appear daily in the criminal courts. Each unhappy criminal case is unhappy in its own fashion. None resembles another. Only judicial, jury and prosecutorial discretion can deal with this pervasive uniqueness. And in capital cases, the exercise. of jury discretion respecting the sentence must be controlled by clear and objective standards that promote a nondiscriminatory application.
Aristotle, in Nicomachean Ethics (book V, ch 10), presented this view of the essential and equitable need for discretion in the sentencing function: "All law is universal. But on some subjects it is not possible to speak universally with correctness. In those cases where it is necessary to speak universally, but impossible to do so correctly, the law addresses itself to *405 the usual case, though it is well aware of the possibility of error. And the law is not, therefore, less right. For the fault is not in the law, nor in the legislator, but in the nature of the thing, since the subject matter of human conduct is of this description. When, therefore, the law speaks universally, and a case arises that is different from the usual case, then it is proper, where the legislator has failed us and has erred by speaking generally, to correct the deficiency. That is, it is proper to do what the legislator would himself direct if he were then present, or as he would have legislated if he had been aware of the particular case * * * And this is the nature of the equitable: a correction of the law where it is defective owing to its universality.” Judicial discretion in the sentencing function — required by the Constitution in every capital case — is a recognition that on the subject of sentencing a human being to death it is never possible for any legislative body, in formulating a sentencing scheme, to speak universally with correctness.
A bifurcated trial is required before the ultimate sanction of death is imposed upon a convicted murderer. At the penalty stage, the jury acts as the conscience of the community. It must be entrusted with the determination of whether vel non, in a particular case, the death penalty should or should not be imposed. This grave determination may be made only within the framework of clearly established standards and guidelines.
The United States Constitution requires that a jury, before recommending or fixing the death penalty, be accorded an opportunity to consider the character and background of the defendant as well as the attendant circumstances of the crime itself. The sentencing authority — jury or court — must consider, after a guilty verdict, why the death penalty should be imposed and why it should not be imposed. This consideration must be made within the context of clear standards and guidelines. Section 60.06 of the Penal Law impermissibly prevents the court or jury from considering any relevant sentencing information. It is, for the reasons stated in this opinion, and on the basis of the holding in Woodson and Roberts (supra), declared to be violative of the Eighth and Fourteenth Amendments as interpreted by the United States Supreme Court. Defendant shall be sentenced to life imprisonment in the manner prescribed by law.