**STATE of Missouri, Appellant,**

v.

**Billy DUREN, Respondent.**

**No. 59763.**

Supreme Court of Missouri, En Banc.

March 15, 1977.

Edward H. Stratemeier, Kansas City, for respondent.

MORGAN, Judge.

On April 30, 1976, a grand jury returned an indictment wherein respondent was charged with "capital" murder under the provisions of §§ 559.005 and 559.009, RSMo Supp. 1975. Thereafter, the trial court found that said statutes authorized imposition of the death penalty in a manner violative of the Eighth and Fourteenth Amendments to the United States Constitution and thus declared the same to be unconstitutional. Upon respondent's motion, the court dismissed the indictment. Pursuant to Rule 28.04, the state appealed to this court which has exclusive jurisdiction by virtue of § 3 of Article 5 of the Missouri Constitution.

Prior to enactment of the statutes above noted and now herein challenged, the definition of illegal homicides and the penalties prescribed therefor were, in this state, as follows:

559.010. *Murder in the first degree*

Every murder which shall be committed by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing, and every homicide which shall be committed in the perpetration or attempt to perpetrate any arson, rape, robbery, burglary or mayhem, shall be deemed murder in the first degree.

559.020. *Murder in the second degree*

All other kinds of murder at common law, not herein declared to be manslaughter or justifiable or excusable homicide, shall be deemed murder in the second degree.

559.030. *Trials for murder, verdict and punishment*

Upon the trial of an indictment for murder in the first degree, the jury must inquire, and by their verdict ascertain, under the instructions of the court, whether the defendant be guilty of murder in the first or second degree; and

Preston Dean, Asst. Atty. Gen., Jefferson City, for appellant.

persons convicted of murder in the first degree shall suffer death, or be punished by imprisonment in the penitentiary during their natural lives; those convicted of murder in the second degree shall be punished by imprisonment in the penitentiary not less than ten years. (Emphasis added.)

As shown by the italicized portion of the last section quoted, alternative penalties of death or life imprisonment were authorized; and, subject to the discretion of the sentencing authority, either could be assessed against a person convicted of first degree murder. This court, historically, approved of such a procedure. For instance, as said in *Duisen v. State,* 441 S.W.2d 688 (Mo. banc 1969) at page 692: "Many years ago the legislative branch declared the policy of this state to be that for the offense of first degree murder the punishment shall be either life imprisonment or death. That policy entrusts absolute discretion in a jury to make the decision whether the punishment assessed shall be one or the other, without standards or rules to guide the jury in making that decision. This policy has been in effect well over a century." More recently, this court in *State v. Coleman,* 460 S.W.2d 719 (Mo. banc 1970), reaffirmed its approval of such statutorily authorized discretion, as shown at page 730: "The decision to assess the death penalty is certain to be a most unpleasant duty for members of a jury and it is safe to assume that it is never done unless every juror is thoroughly convinced that nothing short of that would accomplish the ends of justice. We have the view that juries can be confidently trusted to exercise a wise discretion in determining when the death penalty should be imposed and that standards to guide the jurors are not necessary and would probably not be helpful."

However, the United States Supreme Court on June 29, 1972, handed down its decision in *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346, wherein it rejected imposition of the death penalty in each of three cases involving discretionary alternative punishments. The General As-sembly of Missouri, as did many other legislative bodies, construed the holding in *Furman* as proscribing discretionary procedures and responded thereto by enacting a mandatory death penalty for offenses classified as "capital" murder—which, in fact, are those offenses formerly constituting first degree murder with felony murders removed. Consistent therewith, those sections heretofore quoted were repealed and the following were enacted:

559.005. *Capital murder defined*

A person is guilty of capital murder if he unlawfully, willfully, knowingly, deliberately, and with premeditation kills or causes the killing of a human being.

559.007. *First degree murder defined*

The unlawful killing of a human being when committed without a premeditated intent to cause the death of a particular individual but when committed in the perpetration of or in the attempt to perpetrate arson, rape, robbery, burglary, or kidnapping is murder in the first degree.

559.009. *Degree of homicide, jury to determine—punishments for various degrees*

1. Upon the trial of an indictment or information for capital murder, the jury must inquire, under such instructions as the court finds are justified by the evidence, and by their verdict ascertain, whether the defendant is guilty of capital murder, murder in the first degree, murder in the second degree, or manslaughter.

2. Upon the trial of an indictment or information for murder in the first degree, the jury must inquire under such instructions as the court finds are justified by the evidence, and by their verdict ascertain, whether the defendant is guilty of murder in the first degree, murder in the second degree, or manslaughter.

3. *Persons convicted of capital murder shall be punished by death.* Persons convicted of murder in the first degree shall be punished by imprisonment by the division of corrections during their natural lives. Persons convicted of murder in the

second degree shall be punished by imprisonment by the division of corrections for a term of not less than ten years. (Emphasis added.)

On July 2, 1976, the United States Supreme Court handed down five opinions which seek to explain, among other things, that the court in *Furman* did not reject "discretion" but only that "unbridled discretion" which created a substantial risk that the death penalty would be inflicted in an arbitrary and capricious manner—or, in other words, "freakishly imposed." Therein, the concerns expressed in *Furman* are articulated and the crucial thread running throughout each case is the mandate that a decision to take or spare a human life must be predicated on a "suitably directed" discretion. They are: *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859; *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929; *Proffitt v. Florida,* 428 U.S..242, 96 S.Ct. 2960, 49 L.Ed.2d 913; *Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944; and *Roberts v. Louisiana,* 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974.

The court did not, in the five cases noted, establish specific standards for imposition of the death penalty but considered separately the distinctive statutory procedures found in each.[1] As said in *Gregg* (428 U.S., pp. 193, 194 and 195, 96 S.Ct., p. 2934):

> While some have suggested that standards to guide a capital jury's sentencing deliberations are impossible to formulate, the fact is that such standards have been developed. When the drafters of the Model Penal Code faced this problem, they concluded 'that it is within the realm of possibility to point to the main circumstances of aggravation and of mitigation that should be weighed, *and weighed against each other,* when they are presented in a concrete case.' Model Penal Code § 201.6, Comment 3, p. 71 (Tent. Draft No. 9, 1959) (emphasis original). [Text thereof is quoted in footnote No.

44]. While such standards are by necessity somewhat general, they do provide guidance to the sentencing authority and thereby reduce the likelihood that it will impose a sentence that fairly can be called capricious or arbitrary. Where the sentencing authority is required to specify the factors it relied upon in reaching its decision, the further safeguard of meaningful appellate review is available to ensure that death sentences are not imposed capriciously or in a freakish manner.

In summary, the concerns expressed in *Furman* that the penalty of death not be imposed in an arbitrary or capricious manner can be met by a carefully drafted statute that ensures that the sentencing authority is given adequate information and guidance. As a general proposition these concerns are best met by a system that provides for a bifurcated proceeding at which the sentencing authority is apprised of the information relevant to the imposition of sentence and provided with standards to guide its use of the information.

We do not intend to suggest that only the above-described procedures would be permissible under *Furman* or that the sentencing system constructed along these general lines would inevitably satisfy the concerns of *Furman,* for each distinct system must be examined on an individual basis. Rather, we have embarked upon this general exposition to make clear that it is possible to construct capital-sentencing systems capable of meeting *Furman's* constitutional concerns.

Of more immediate interest is the court's holding in *Woodson* wherein a post-*Furman* enacted mandatory death penalty statute was rejected. As said therein (428 U.S. pp. 303, 304, 96 S.Ct. p. 2991):

> North Carolina's mandatory death penalty statute provides no standards to guide the jury in its inevitable exercise of the power to determine which first-degree

---

1. Procedures found in *Gregg, Jurek* and *Proffitt* were approved while those in *Woodson* and *Roberts* were rejected.

murderers shall live and which shall die. And there is no way under the North Carolina law for the judiciary to check arbitrary and capricious exercise of that power through a review of death sentences. Instead of rationalizing the sentencing process, a mandatory scheme may well exacerbate the problem identified in *Furman* by resting the penalty determination on the particular jury's willingness to act lawlessly. While a mandatory death penalty statute may reasonably be expected to increase the number of persons sentenced to death, it does not fulfill *Furman's* basic requirement by replacing arbitrary and wanton jury discretion with objective standards to guide, regularize, and make rationally reviewable the process for imposing a sentence of death.

\* \* \* \* \* \*

A process that accords no significance to relevant facets of the character and record of the individual offender or the circumstances of the particular offense excludes from consideration in fixing the ultimate punishment of death the possibility of compassionate or mitigating factors stemming from the diverse frailities of humankind. It treats all persons convicted of a designated offense not as uniquely individual human beings, but as members of a faceless, undifferentiated mass to be subjected to the blind infliction of the penalty of death.

■ That the statutes herein challenged fail to provide a constitutionally acceptable procedure in Missouri for imposition of the death penalty is readily apparent and we so hold. A very comprehensive analysis of the question and its related problems may be found in 45 UMKC Law Review 223, Turner—*Missouri's Unconstitutional Death Penalty: A Proposal for Reform.*[2]

One question remains. What, if any, viability does the instant indictment for "capi-

tal" murder now have absent the death penalty?

The answer to such an inquiry was developed more fully in two other cases involving the same statutes, i. e., *State ex rel. Douglas v. Keet,* Mo., 547 S.W.2d 481 and *State ex rel. Locke v. Burkart,* Mo., 548 S.W.2d 550 and we have considered the arguments therein since a decision in each of the three cases will be entered at the same time.

The General Assembly, obviously appreciative of the confusion surrounding death penalty statutes and recognizing the lack of any definitive law in that area, passed the following section at the same time as it did §§ 559.005 and 559.009 (All being part of H.B. No. 150, Laws 1975), to-wit:

559.011. *Alternative punishment if death penalty declared unconstitutional*
If the category of capital murder or the penalty prescribed herein is declared to be unconstitutional by the Missouri supreme court or the United States Supreme Court, all killings which would be capital murder under any of the circumstances specified in section 559.005 shall be deemed to be murder in the first degree and the offender shall be punished accordingly, except that he shall not be eligible for probation or parole until he has served a minimum of fifty years of his sentence.

■ First, it is argued that the "alternative" statute cannot be brought into play because the death penalty was not found to be unconstitutional *per se* in *Gregg* and its companion cases. We think the argument lacks merit. In the first place, the legislative intent obviously was to provide for the possibility the "penalty" could not be imposed for any reason; and secondly, this court, now having ruled that the "penalty" is unconstitutional under the existing stat-

**2.** Recent representative efforts by other courts to apply the dictates of *Gregg* and its companion cases to particular statutory schemes may be found in *Jackson v. State,* 337 So.2d 1242 (Miss.1976); and in Volume 20 of the Criminal Law Reporter at the pages indicated: *State v. Lee,* 114 Ariz. 101, 559 P.2d 657; *State v.*

*Bayless,* 48 Ohio St.2d 73, 357 N.E.2d 1035; *State v. McKenzie,* Mont., 557 P.2d 1023; *Rockwell v. Superior Court,* 18 Cal.3d 420, 134 Cal.Rptr. 650, 556 P.2d 1101; *Commonwealth v. Moody,* Pa.Ct.Comm. Pleas p. 2259; *People v. Velez,* Supp., 388 N.Y.S.2d 519 and *Blackwell v. State,* 278 Md. 466, 365 A.2d 545.

utes, has made the second contingency effective.

■ Second, we do not believe that § 559.011 is violative of § 28 of Article 3 of the Missouri Constitution and the holding in *State ex rel. McNary v. Stussie,* 518 S.W.2d 630 (Mo. banc 1974), pertaining to the amendment of statutes , for the simple reason § 559.011 is not an amendment to §§ 559.005 and 559.009 but was enacted at one time as part of one law in House Bill No. 150, Laws 1975.

■ Third, our holding that § 559.011 is a viable statute precludes any argument that "capital" murder cannot be a crime because no penalty therefor is provided. *State v. Harper,* 510 S.W.2d 749 (Mo.App.1974) is not controlling.

■ Fourth, an improper delegation of legislative power to the courts does not result. After the opinion in *Furman,* this court found it necessary to substitute life sentences for the death penalty in several cases. The only difference being that this time the General Assembly anticipated as much.

■ As a result, the use of the term "capital" murder in both the title and body of § 559.005 (and in the other sections) is a misnomer and perhaps grammatically now incorrect. However, there is no law of which we are aware preventing such a designation for the crime therein defined.

■ Lastly, there remains both a crime and a penalty which facially sustain the indictment in question.

The judgment of the trial court holding the death penalty unconstitutional under the statutes noted is affirmed, but the order of dismissal of the indictment is reversed and the cause is remanded for further proceedings not inconsistent with this opinion.

BARDGETT, HENLEY, FINCH, DONNELLY and RENDLEN, JJ., concur.

SEILER, C. J., concurs in part and dubitative in part in separate opinion filed.

SEILER, Chief Justice, concurring in part and dubitative in part.

I concur in that portion of the principal opinion which holds the Missouri procedure governing imposition of the death penalty unconstitutional, but further, I am constrained to vote dubitante in relation to that portion of the principal opinion which upholds the validity of the alternative provision. I am unconvinced that legislation may legally spring forth into existence upon the event of a court fulfilling its mandated duty. Additionally, I am not convinced that the alternative provision which requires a minimum incarceration of fifty years as a condition precedent to parole or probation eligibility is neither cruel and unusual punishment nor violative of due process.

Many would regard incarceration for a minimum of fifty years with no glimmer of hope for probation or parole as a fate worse than death.