STATE ex rel. George R. WESTFALL,
Relator,

v.

Hon. Donald L. MASON, Judge, 16th
Judicial Circuit, Respondent.

No. 61499.

Supreme Court of Missouri,
En Banc.

Feb. 11, 1980.

As Modified On Denial of Rehearing
March 11, 1980.

James J. Cook, Asst. Pros. Atty., for relator.

Richard H. Sindel, St. Louis, Gail Gaus, Clayton, for respondent.

RENDLEN, Judge.

I

Prohibition, to prevent respondent, the Honorable Donald L. Mason[1] Judge of the Sixteenth Judicial Circuit, from proceeding in the retrial of Robert Bullington for capital murder (the indictment charged numerous offenses) without allowing the prosecution to seek imposition of the death penalty.

Prior to trial in 1978 the State under § 565.006(2), RSMo 1978,[2] filed a "Notice of Evidence in Aggravation" announcing its intention to seek the death penalty in the capital murder charge. That trial resulted in a verdict of guilty on all counts including capital murder, October 11, 1978. A hearing was conducted the next day under the bifurcated procedure mandated by § 565.-006, RSMo 1978, in which the jury was presented additional evidence in "extenuation, mitigation, and aggravation" of punishment. The jury directed that defendant be sentenced to life imprisonment without probation or parole for not less than fifty years.

---

1. Defendant was charged in the Circuit Court of St. Louis County by indictment with capital murder, kidnapping, armed criminal action, burglary first degree and two counts of flourishing a deadly weapon. The cause was transferred on change of venue to the Sixteenth Judicial Circuit in Jackson County, Missouri.

2. See also § 565.006 RSMo Supp.1979 (as amended) (effective date September 28, 1979).

Defendant's motion for new trial, challenging the constitutionality of the Jackson County jury panel, was sustained February 13, 1979, in light of the United States Supreme Court's holding in *Duren v. Missouri*, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979). In preparation for Bullington's retrial the State has filed a second "Notice of Evidence in Aggravation" indicating its continued intention to seek the death penalty.[3] Responding, defendant moved to strike that "Notice" and to exclude from trial all evidence in aggravation of punishment. Respondent announced his intention to enter an order sustaining defendant's motion to strike, "to the extent that the state will not be permitted to seek the death penalty, should the defendant again be found guilty of capital murder." Relator then sought prohibition and for reasons now discussed, our preliminary rule heretofore entered is made absolute.

## II

Respondent first contends prohibition is inappropriate procedurally because (1) relator (Prosecuting Attorney of St. Louis County) failed to allege the State had no adequate remedy at law, (2) that the state's limited right of appeal forecloses resort to prohibition, and (3) the issue does not involve the jurisdiction of the trial court. The first contention may be disposed of summarily. On October 2, 1979, by order of this Court relator was permitted to amend its petition and allege the State had no adequate remedy at law. As to respondent's second argument it is precisely because the state has an extremely limited right of appeal under § 547.210, RSMo 1978, and Rule 28:04 (now Rule 30.02) that extraordinary relief is proper to review interlocutory orders in criminal cases. See *State ex*

*rel. Corcoran v. Buder*, 428 S.W.2d 935, 939 (Mo.App.1968). Further, it is settled law that, "The writ is properly invoked to restrain the enforcement of orders beyond or in excess of the authority of a judge and to keep a court within the compass of its jurisdiction." *State ex rel. Vogel v. Campbell*, 505 S.W.2d 54, 58 (Mo. banc 1974). Because, as we shall presently discuss, neither the federal nor state constitutions nor Missouri law prevent Bullington from being subject to the death penalty on retrial, the trial court exceeded (or by its announced order would have exceeded) its authority in denying the state leave to seek imposition of the death penalty. Accordingly, prohibition lies. See *State ex rel. Peach v. Bloom*, 576 S.W.2d 744 (Mo. banc 1979).

## III

The principal question for our determination is whether on retrial the death penalty under § 565.008, RSMo 1978 is barred as possible punishment by constitutional or statutory considerations. Respondent argues that because the jury in the first trial convicted Bullington of capital murder but sentenced him to life, the fifth amendment's prohibition against double jeopardy, the eighth amendment's proscription of cruel and unusual punishment, the fourteenth amendment's guarantee of due process and § 565.014.3(3), RSMo 1978, prevent the State from continuing to seek the death penalty. Long settled constitutional doctrine enunciated by this Court and reiterated in recent decisions of the United States Supreme Court leads to rejection of these challenges.

A defendant successfully overturning a conviction for a particular offense may in most instances be retried for that *offense* notwithstanding double jeopardy

---

**3.** The notice advises the State will present evidence of two aggravating circumstances. First, that the killing was committed by a person with substantial history of serious assaultive convictions. § 565.012.2(1), RSMo 1978. Second, that the offense was outrageously or wantonly vile, horrible or inhuman. § 565.012.-2(7), RSMo 1978.

doctrine.[4] *United States v. Ball*, 163 U.S. 662, 672, 16 S.Ct. 1192, 1195, 41 L.Ed. 300 (1896); *Forman v. United States*, 361 U.S. 416, 425, 80 S.Ct. 481, 486, 4 L.Ed.2d 412 (1960); *United States v. Ewell*, 383 U.S. 116, 121, 86 S.Ct. 773, 777, 15 L.Ed.2d 627 (1966). In some cases the rationale for such results has been couched in language of a waiver theory and in others that retrial constitutes but continuing jeopardy. However the rule is more usually described in terms of policy considerations. As Mr. Justice Harlan explained in *United States v. Tateo*, 377 U.S. 463, 466, 84 S.Ct. 1587, 1589, 12 L.Ed.2d 448 (1964),

> While different theories have been advanced to support the permissibility of retrial, of greater importance than the conceptual abstractions employed to explain the *Ball* principle are the implications of that principle for the sound administration of justice. Corresponding to the right of an accused to be given a fair trial is the societal interest in punishing one whose guilt is clear after he has obtained such a trial. It would be a high price indeed for society to pay were every accused granted immunity from punishment because of any defect sufficient to constitute reversible error in the proceedings leading to conviction. From the standpoint of a defendant, it is at least doubtful that appellate courts would be as zealous as they now are in protecting against the effects of improprieties at the trial or pretrial stage if they knew that reversal of a conviction would put the accused irrevocably beyond the reach of further prosecution. In reality, therefore, the practice of retrial serves defendants' rights as well as society's interest.

Essentially respondent argues that the federal double jeopardy clause prohibits not the retrial for the *offense* of capital murder (Bullington *was convicted* of that *offense*) but only the imposition of a more severe

punishment upon retrial. Such contention was squarely rejected sixty years ago in *Stroud v. United States*, 251 U.S. 15, 40 S.Ct. 50, 64 L.Ed. 103 (1919). There defendant[5] was convicted in a second trial for the murder of a prison guard and sentenced to life imprisonment by the jury. On retrial (his third) secured by Stroud, the new jury also convicted him of first degree murder and he was sentenced to death. The Court held the fact that Stroud was subjected to the increased punishment of death upon retrial did not place him in double jeopardy. In *North Carolina v. Pearce*, 395 U.S. 711, 720, 89 S.Ct. 2072, 2078, 23 L.Ed.2d 656 (1969), the Court reaffirmed that a necessary corollary of the power to retry a defendant is the state's power to impose any legally authorized sentence upon reconviction, though greater than the sentence originally imposed. In refusing to depart from an unbroken 75 year line of decision supporting this principle, the court explained, "[T]he original conviction has, at the defendant's behest, been wholly nullified and the slate wiped clean." *Id.* at 721, 89 S.Ct. at 2078. Recently the Court referred to Stroud as a "well-established part of our constitutional jurisprudence" and specifically declined an invitation to discard the principles stated there. *Chaffin v. Stynchcombe*, 412 U.S. 17, 24, 93 S.Ct. 1977, 1981, 36 L.Ed.2d 714 (1973). Within the past year the United States Court of Appeals for the Sixth Circuit, following *Stroud* and rejecting this same argument, held that the fifth amendment does not forbid imposition of the death penalty on retrial of defendant for an offense upon which he was originally sentenced to life. *Gully v. Kunzman*, 592 F.2d 283, 289 (6th Cir. 1979), *cert. denied*, 442 U.S. 924, 99 S.Ct. 2850, 61 L.Ed.2d 292 (1979).

Despite respondent's stated intention to circumvent the effect of *Stroud* and the decisions following it, we find nothing in

---

4. For a limited exception to this rule see *Burks v. United States*, 437 U.S. 1, 18, 98 S.Ct. 2141, 2150, 57 L.Ed.2d 1 (1978).

5. Stroud was popularly known as the "Birdman of Alcatraz."

the federal constitutional guarantee against double jeopardy to prevent the state from seeking the death penalty on Bullington's retrial for capital murder.

Respondent quite untenably suggests that the legislature has bisected the crime of capital murder defined in § 565.001, RSMo 1978.[6] He argues that if life imprisonment is the penalty imposed, the offense is somehow transfigured and changed into a *lesser included offense* of capital murder with capital punishment and becomes the crime of capital murder without capital punishment. Thus, he concludes, the jury's imposition of life imprisonment implicitly constitutes an acquittal of the greater offense. We are unwilling and indeed are unauthorized to indulge such fiction. It is not our prerogative to create separate crimes from those defined by statute. The simple fact is that capital murder under § 565.001, RSMo 1978 is a single crime with the range of punishment established by the legislature at life imprisonment without probation or parole for 50 years to the death penalty. Respondent's argument not only runs contrary to the decided cases, it ignores the statutory sections which define capital murder, prescribe the punishments for that offense, and detail the procedures for imposing those punishments. As noted above, there is but one crime defined as capital murder and the acts proscribed are specified in § 565.001. It was for that

offense Bullington stood convicted following the first trial and it is for that offense he remains charged and awaits retrial.

■ As recognized by this Court in *State v. Duren,* 547 S.W.2d 476, 478–480 (Mo. banc 1977), federal constitutional requirements forbade mandatory imposition of capital punishment. In response to the constitutional directive that the jury's discretion in capital sentencing be "suitably directed" so as to minimize the risk of arbitrary and capricious application, *Gregg v. Georgia,* 428 U.S. 153, 189, 96 S.Ct. 2909, 2932, 49 L.Ed.2d 859 (1976), and that consideration of the individual circumstances of each offender and crime was "constitutionally indispensable," *Woodson v. North Carolina,* 428 U.S. 280, 304, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976), the Missouri legislature enacted § 565.006 and § 565.012, RSMo 1978, providing for a presentence hearing following a conviction for capital murder at which time aggravating and mitigating circumstances as to the offender and the offense would be considered.[7] The existence of these sentencing procedures does not alter the fact that capital murder by statutory definition § 565.001, RSMo 1978, is a single offense, namely the unlawful, willful, knowing, deliberate and premeditated killing of another human being. The jury, in the § 565.006 proceeding, does not reconsider the issue of guilt, for that has been previously determined. Instead, at that

---

**6.** Section 565.001, RSMo 1978, provides: "Any person who unlawfully, willfully, knowingly, deliberately, and with premeditation kills or causes the killing of another human being is guilty of the offense of capital murder."

**7.** The United States Supreme Court clarified the constitutional standards for imposition of the death penalty in five opinions announced in 1976. *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976); *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976); *Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976); and *Roberts v. Louisiana,* 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976). In these opinions the court struck down as unconstitutional the North Carolina and Louisiana statutes providing for mandatory

imposition of the death penalty and upheld the capital sentencing procedures enacted by Georgia, Texas and Florida. As explained in *Gregg,* "[T]he concerns expressed in *Furman* that the penalty of death should not be imposed in an arbitrary or capricious manner can be met by a carefully drafted statute that ensures that the sentencing authority is given adequate information and guidance. As a general proposition these concerns are best met by a system that provides for a bifurcated proceeding at which the sentencing authority is apprised of the information relevant to the imposition of sentence and provided with standards to guide its use of the information." *Gregg v. Georgia,* 428 U.S. 153, 195, 96 S.Ct. 2909, 2935, 49 L.Ed.2d 859 (1976).

stage they decide only the punishment to be imposed. In sum, the fact that the jury will consider *the range of punishment* for the offense of capital murder does not as respondent argues rend the crime of capital murder and create discrete offenses. The *Stroud* court dismissed such argument stating, "The fact that the jury may thus mitigate the punishment to imprisonment for life did not render the conviction less than one for the first degree murder." *Stroud v. United States*, 251 U.S. 15, 18, 40 S.Ct. 50, 51, 64 L.Ed. 103 (1919). See *Redd v. State*, 242 Ga. 876, 252 S.E.2d 383, 389 (1979), *cert. denied*, 442 U.S. 934, 99 S.Ct. 2870, 61 L.Ed.2d 304.

Respondent also argues that the doctrine of collateral estoppel as embodied in the fifth amendment's protection against double jeopardy forecloses the state from seeking the death penalty if Bullington is again convicted of capital murder, and points to *Ashe v. Swenson*, 397 U.S. 436, 445, 90 S.Ct. 1189, 1195, 25 L.Ed.2d 469 (1970). In *Ashe* the concept of collateral estoppel was elevated to the level of double jeopardy. There several poker players at their game table were robbed. Defendant was tried and acquitted for the crime of robbing player # 1. An element necessary for conviction of that crime, (identity of the accused as the robber) was found against the State and defendant acquitted under his theory of alibi. In a later trial for the robbery of poker player # 2 the Court deemed it double jeopardy to relitigate the identity issue. The *Ashe* Court stated that whether an issue of ultimate fact necessary for conviction is determined by a general jury verdict requires a court, "to 'examine the record of a prior proceeding, taking into account the pleadings, evidence, charge and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration'." *Ashe v. Swenson*, 397 U.S. at 444, 90 S.Ct. at 1194.

Respondent argues that a finding of no aggravation is necessary to the first jury's finding that defendant suffer life imprisonment rather than death for the crime of capital murder; hence the State is estopped from seeking to prove aggravation in the second trial. This contention is without merit for a number of reasons. A rational factfinder might well premise its imposition of life imprisonment on various factors other than the absence of aggravation. The applicable instructions drafted by the Supreme Court Committee on Patterned Criminal Charges and Instructions for death penalty proceedings demonstrate this option in the jury. Under MAI–CR 15.42 if the jury finds that at least one of the statutory aggravating circumstances exists, it must decide whether it is a "sufficient aggravating circumstance" to warrant the imposition of the death penalty. Even then the jury need not impose death if in its weighing process it intuitively feels the mitigating circumstance(s) tips the scale against the death penalty. MAI–CR 15.44. Finally, though the jury finds that sufficient mitigating circumstance(s) have not been shown, defendant is given the further benefit of our Instruction MAI–CR 15.46 which provides: "[Y]ou are not compelled to fix death as the punishment. Whether that is to be your final decision rests with you." Thus the predilections of the jury as to mercy and the death penalty remain a part of the system within the limits and safeguards established by statute.

Clearly the first jury might have imposed life imprisonment in response to a defendant's plea for mercy rather than finding no aggravation. *Ashe v. Swenson* is inapposite here and the State is not precluded from seeking the death penalty by any aspect of the fifth amendment's protection against double jeopardy.

Respondent, relying on *North Carolina v. Pearce*, 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969), next argues that allowing the prosecution to seek the death penalty, should Bullington be reconvicted of capital murder, would violate principles of due process in that a finding of capital punish-

ment by the jury at retrial would be "tainted by vindictiveness." However, *Pearce* is not controlling here. In that case, defendant's conviction was reversed through collateral attack but on retrial he was again convicted and when resentenced by the court received more severe punishment than that originally imposed. *Id.* at 713–714, 89 S.Ct. at 2074–2075. The *Pearce* Court concluded, "Due process of law, then, requires that *vindictiveness* against a defendant for having successfully attacked his first conviction must play no part in the sentence he receives after a new trial. . . [D]ue process also requires that a defendant be freed of apprehension of such a retaliatory motivation on the part of the *sentencing judge*." *Id.* at 725, 89 S.Ct. at 2080. (Emphasis ours.) This exposure to possible vindictiveness of the sentencing judge does not occur in the jury sentencing process under Missouri's capital murder statutes.

■ The due process clause is not violated by all possibilities of increased punishment upon retrial, "but only by those that pose a realistic likelihood of vindictiveness." *Blackledge v. Perry*, 417 U.S. 21, 27, 94 S.Ct. 2098, 2102, 40 L.Ed.2d 628 (1974). See *Colten v. Kentucky*, 407 U.S. 104, 116, 92 S.Ct. 1953, 1960, 32 L.Ed.2d 584 (1972). *Ludwig v. Massachusetts*, 427 U.S. 618, 627, 96 S.Ct. 2781, 2786, 49 L.Ed.2d 732 (1976). In this connection the Supreme Court held recently that *Pearce*-like restrictions were inapplicable in *jury resentencing* at least where improper and prejudicial information regarding the prior sentence is withheld. *Chaffin v. Stynchcombe*, 412 U.S. 17, 28, 93 S.Ct. 1977, 1983, 36 L.Ed.2d 714 (1973). The *Chaffin* court found the potential for vindictiveness in jury resentencing, de minimis for these reasons: First, a retrial jury in the normal course of events will be unaware of the disposition of the prior proceeding. Second, juries, unlike a trial judge, who has been reversed on appeal, will have no personal stake in the prior conviction and no motivation to engage in self-vindication on remand. Third, juries

will not be sensitive to the institutional interests which might be promoted by imposing higher sentences after appeal as a means of discouraging meritless appeal. *Id.* at 26–27, 93 S.Ct. at 1982–1983.

Respondent, in a final attempt to circumvent the clear import of *Chaffin*, suggests that because that case did not involve a bifurcated proceeding as provided under the Missouri capital murder statute, the holding there does not control our case. However, this overlooks the fact that *Chaffin* states:

While some jury-sentencing States have adopted bifurcated jury trials, in which the jury assesses the punishment in a separate proceeding after a verdict of guilty has been rendered [citations omitted], bifurcation alone would not wipe away the fundamental differences between jury and judicial sentencing. It may make little sense to supply the jury with information about the defendant's conduct if the goal of jury sentencing is not necessarily to fit the punishment to the offender, and if the jury is, therefore, not concerned about matters considered pertinent to judicial sentencing.

Petitioner and recent court of appeals cases suggest that an approximation of the *Pearce* limitations could be realized either by instructing the jury that it may return no verdict higher than the former sentence, or by empowering the judge to reduce the second sentence whenever it exceeds the former sentence. [citations omitted.] Although these alternatives would provide an absolute protection from the possibility of vindictiveness, they would also interfere with ordinary sentencing discretion in a manner more intrusive than contemplated by *Pearce*. They would achieve, in the name of due process, the substance of the result we have declined to approve under the Double Jeopardy Clause.

*Id.* at 28 n. 15, 93 S.Ct. at 1983–1984 n. 15.

Such constraints upon jury discretion as those urged by respondent would be particularly unfortunate in the capital sentencing

area where individualized consideration of each offender is constitutionally required. *Lockett v. Ohio*, 438 U.S. 586, 604, 98 S.Ct. 2954, 2964, 57 L.Ed.2d 973 (1978).

Missouri decisions, prior to *Chaffin*, recognized that "vindictiveness" has no relevance to jury resentencing. See *Spidle v. State*, 446 S.W.2d 793, 795 (Mo.1969). *Kansas City v. Henderson*, 468 S.W.2d 48, 52–53 (Mo.1971), *cert. denied*, 404 U.S. 1004, 92 S.Ct. 570, 30 L.Ed.2d 557 (1971). Accordingly, we find that as a jury will decide whether Bullington should be subject to the death penalty if he is reconvicted of capital murder, there is no realistic likelihood of vindictiveness on retrial. It is appropriate to reemphasize that defendant has been awarded a retrial which *he sought* and it does not violate due process to permit such trial for the crime he was originally and still stands charged. Nor does the award of a new trial alter the range of punishment prescribed by the statute. The decision as to punishment under the prescribed procedure is that of the individual jury, not to be engrafted upon or controlling of a new jury not yet empaneled. To hold otherwise would distort the clear purpose of the statutory scheme which offers protection against aberrant results by establishing a system that allows the trier of fact (1) to determine guilt or innocence without the distraction of evidence irrelevant to that issue (§ 565.006), (2) if a guilty verdict is returned to consider facts in aggravation and mitigation as they relate to punishment (§ 565.006(2)), and (3) provides a system of mandatory review (§ 565.014) that guards against, among other things, a sentence imposed "under influence of passion, prejudice or any other arbitrary factor." (§ 565.014.3(1)). This is not a deprivation of due process, but an extension to a high order of the process due the accused. The subsequent jury will decide the issues anew and it is their responsibility to determine guilt and assess the punishment upon conviction (§ 565.006.2). Further, if on appeal reversal occurs "because of error only in the presentence hearing, the new trial . . . shall apply only to

the issue of punishment." § 565.006(3). There is no suggestion in this language that on such new trial the range of punishment is restricted to life imprisonment only. To the contrary, the choice of punishment is the principal issue to be decided in such a new trial.

Respondent next contends the possibility of a harsher sentence on retrial would unconstitutionally chill defendant's rights of appeal. We do not agree. *United States v. Jackson*, 390 U.S. 570, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968), cited by respondent as authority, involved a federal anti-kidnapping statute which allowed only the imposition of the death penalty following a jury trial. See 18 U.S.C. § 1201(a) (amended 1972). That statute was held to unconstitutionally deter the exercise of a defendant's fifth and sixth amendment rights to insist upon his innocence and demand a trial by jury. 390 U.S. at 581–583, 88 S.Ct. at 1216–1217. Unlike the federal statute which singled for punishment by death that class of defendants who sought jury trials, the Missouri capital murder statutes draw no such invidious distinction.

■ Recent authority demonstrates that *Jackson* should be limited to statutes of the type which on their face penalize the assertion of constitutional rights. In *Brady v. United States*, 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970) and *North Carolina v. Alford*, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970), defendants entered pleas of guilty to avoid the possibility of the imposition of capital punishment by a jury. The United States Supreme Court held that the fact a plea was entered to avoid the imposition of the death penalty by a jury did not *ipso facto* render the plea involuntary. *Brady v. United States*, 397 U.S. 742, 751, 90 S.Ct. 1463, 1470, 25 L.Ed.2d 747 (1970); *North Carolina v. Alford*, 400 U.S. 25, 31, 91 S.Ct. 160, 164, 27 L.Ed.2d 162 (1970). If the threat of the death penalty does not impermissibly coerce guilty pleas and encourage waiver of the plethora of rights guaranteed in a criminal trial under the fourth, fifth,

sixth and fourteenth amendments, we do not believe the possibility of capital punishment unconstitutionally chills a defendant's right to appeal. This view is supported by that expressed in *Chaffin v. Stynchcombe, supra,* 412 U.S. at 35, 93 S.Ct. at 1986, where it is stated: "The choice occasioned by the possibility of a harsher sentence, even in the case in which the choice may in fact be "difficult,' does not place an impermissible burden on the right of a criminal defendant to appeal or attack collaterally his conviction."

Respondent next contends that § 565.008, RSMo 1978, is unconstitutional because the death penalty permitted therein constitutes cruel and unusual punishment violative of the eighth amendment of the United States constitution and art. I, § 21 of the Constitution of the State of Missouri. This contention, first raised in defendant's Motion to Strike was renewed in respondent's brief before this Court with this language, "the death penalty, . . . is in all circumstances, a cruel and unusual punishment under both Federal and State constitutional provisions . . ." Respondent is quite mistaken, the death penalty is not per se violative of the eighth amendment. See *Gregg v. Georgia,* 428 U.S. 153, 187, 96 S.Ct. 2909, 2931, 49 L.Ed.2d 859 (1976). Further, because the statutory procedures for imposition of the death penalty in Missouri are virtually identical to those contained in the Georgia statute challenged in *Gregg* no serious question remains as to their validity under the federal constitution. See *Gregg v. Georgia,* 428 U.S. 153, 196–207, 96 S.Ct. 2909, 2936–2941, 49 L.Ed.2d ·859; *Lockett v. Ohio,* 438 U.S. 586, 604–605, 98 S.Ct. 2954, 2964–2965, 57 L.Ed.2d 973 (1978).

Thus we need examine only for the validity of § 565.008, RSMo 1978, under art. I, § 21 of the Missouri Constitution.[8] The ultimate question is whether the punishment is disproportionate to the crime for which imposed. *State v. Agee,* 474 S.W.2d 817, 822 (Mo.1971); *State v. Brownridge,* 353 S.W.2d 715, 718 (Mo.1962). In this connection it has been held that a punishment is not cruel simply because it is severe. *Id. State v. Stubblefield,* 157 Mo. 360, 58 S.W. 337, 339 (Mo.1900). When considering the constitutionality of a punishment statute enacted by our legislature, we presume its validity and those who seek to invalidate it bear a heavy burden of demonstrating that it is either barbarous or excessive. *Gregg v. Georgia, supra,* 428 U.S. at 175, 96 S.Ct. at 2926 (1975); See *State v. Mitchell,* 563 S.W.2d .18, 26 (Mo.banc 1978).

We are mindful that the legislature necessarily considered those who have fallen victim to violent crime within our society. Their lives have been taken without notice and no rigorous procedural safeguards protected them from premeditated attack and death. No crime is more disruptive of peace and order or so violative of the rights of the individual as murder. The spread of violent crime threatens the basic fabric of our Republic and surely all right thinking persons recognize that physical security of its members is among the first objects of an organized society. We cannot say that the death penalty is cruel and unusual punishment for those who unlawfully, willfully, knowingly, deliberately, and with premeditation kill another human being. This view finds wide support in the legislative enactments of sister states, as forty jurisdictions attach a penalty of death to certain categories of murder.

Given the extreme nature of the crime of murder, as well as the fact that the overwhelming majority of American jurisdictions allow imposition of capital punishment in specific instances, we will not substitute our judgment for that of our duly elected legislature in this question of policy. We hold § 565.008, RSMo 1978 does not prescribe cruel and unusual punishment in vio-

---

**8.** Art. I, § 21, Mo.Const. provides: "That excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted."

lation of art. I, § 21 of the Missouri Constitution.

■ It is next asserted that the death penalty may not be invoked at Bullington's second trial because § 565.012.2(7), RSMo 1978, which provides one of the two aggravating circumstances the state seeks to prove at retrial, is unconstitutionally vague and overbroad in violation of the fourteenth amendment.[9] The United States Supreme Court, confronted by a similar argument in *Gregg v. Georgia*, 428 U.S. 153, 201, 96 S.Ct. 2909, 2938, 49 L.Ed.2d 859 (1976), as to a Georgia statute (Ga.Code Ann. § 27–2534.-1(b)(7)) with provisions essentially the same as ours, concluded that while it was arguable any murder involves "depravity," the language need not be construed in such a broad fashion. Hence this statutory aggravating circumstance was not found so wanting in precision that it rendered the capital sentencing procedure capable of arbitrary and capricious decision violative of the eighth amendment. We see no reason to find that our almost identical statutory provision violates the fourteenth amendment particularly when the statute and its application is subject to mandatory review by the Missouri Supreme Court in all capital cases.

■ Respondent's final claim is that § 565.014.3(3), RSMo 1978, forbids the prosecution from seeking the death penalty at Bullington's second trial. That statute mandates proportionality review by this Court and that we determine in each case the excessiveness vel non of the death penalty's imposition.[10] We reject the contention that when a jury in the first trial of a capital murder case imposes a life sentence, assessment of capital punishment by any subsequent jury is invariably excessive.

Such argument is little more than a variant of the double jeopardy argument dealt with earlier in this opinion, but respondent, pressing the contention, relies in the main on *Ward v. State*, 239 Ga. 205, 236 S.E.2d 365 (Ga.1977). *Ward* is distinguishable from the case at bar in that the evidence had been presented at the subsequent proceeding and that evidence "was essentially the same" as that presented at the first trial where the jury did not recommend a sentence of death. *Id.*, 236 S.E.2d at 366. No evidence has been adduced in the pending retrial of this cause and we will not indulge the speculation urged as to the State's or defendant's evidence at a future trial, this notwithstanding the argument that the "notice" contains the same general averments as the earlier "notice" and despite relator's statements in oral argument that the state intended to present the same evidence at Bullington's retrial. The evidence finally adduced depends upon the witnesses, not relator's expressed intention. Any rule or decisional pronouncement foreclosing on retrial additional proof in *mitigation or aggravation* within the scope of the notice, is quite unacceptable and we decline respondent's invitation to invoke such a rule as to a single phase of the proof, i. e., *aggravation*. More importantly we decline to follow the Georgia court in the construction of Missouri's death penalty statutes. *Ward* held that once a jury in a capital case finds life imprisonment, a jury sentence of death in any subsequent trial "is obviously disproportionate." *Id.*, 236 S.E.2d at 368. We are not persuaded to this point of view for a number of reasons. As noted above, not only may the proof vary in the second proceeding, but the jury which deemed a life sentence appropriate may well have been aberrant. It cannot be said that the

**9.** Section 565.012.2(7) provides: "The offense was outrageously or wantonly vile, horrible or inhuman in that it involved torture, or depravity of mind."

**10.** Section 565.014.3 provides that in the review of all cases in which capital punishment is imposed this Court shall determine: ". . . .

(2) Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in section 565.012, and (3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."

findings of the first improper jury sound with finality as to aggravation or mitigation as our instructions explicitly allow the juror's individual values to be considered in the capital sentencing process. See MAI–CR 15.46. Also we have no record of the evidence from the first presentence hearing and cannot say what error may have occurred other than the fact the jury selection process in Jackson County was constitutionally infirm. Further, if such record were before us the fact remains it would be impossible to predetermine the evidence emerging in the new trial and we consider it improper to predecide the result that should flow from the proof. Finally, if defendant's (respondent's) argument were accepted that the first jury's decision on punishment binds any later jury, the argument could be made that if the first jury decided on death as an appropriate sentence the second jury's consideration would be limited to only that punishment. Needless to say defendant would promptly abjure that result.

The rule is made absolute.

MORGAN and HIGGINS, JJ., concur.

DONNELLY, J., concurs in separate concurring opinion filed.

WELLIVER, J., concurs in result.

BARDGETT, C. J., dissents in separate dissenting opinion filed.

SEILER, J., dissents in separate dissenting opinion filed.

**DONNELLY, Judge, concurring.**

I would make a few observations on the issue of *double jeopardy*.

My Brother Seiler would, for constitutional purposes, and in a situation calling for a bifurcated proceeding, relate the prohibition against double jeopardy not only to the *offense* of capital murder of which Bullington was convicted but also to the *punishment* imposed for the offense of which he

was convicted. He would reason that Bullington can be retried for the *offense* of which he was originally convicted because he *waived* the double jeopardy protection by attacking the validity of his conviction on *Duren* grounds—but Bullington cannot be subjected to a *punishment* greater than that assessed at his first trial because there was an implied acquittal of punishment by death.

In order to embrace such a position, capital murder must be treated as two offenses (capital murder where death may be imposed and capital murder where imprisonment for at least fifty years may be imposed) *or* it must be assumed that there are two "degrees" of capital murder (one sufficient to impose death and one not).

In my view, the discretion given by statute to assess punishment at less than death does not support either proposition. I find nothing in either constitution which would require that we construe capital murder as constituting two offenses or as being divided into degrees. The jury finding in October 1978 that Bullington should be sentenced to life imprisonment without probation or parole for not less than fifty years was not a determination that any element of the offense of capital murder is lacking. The constraints of double jeopardy are not involved here.

I would also make a few observations about imposition of the *death penalty* under § 565.008, RSMo 1978.

Article I, § 21 of the Constitution of Missouri provides that "excessive bail shall not be required, nor excessive fines imposed, nor *cruel and unusual punishment inflicted.*" (Emphasis supplied.)

In my view, the taking of a life for a life is not always cruel. History teaches us that it is not unusual.

The taking of the life of a human being *by another human being* "unlawfully, willfully, knowingly, deliberately, and with premeditation" (§ 565.001, RSMo 1978) cannot be tolerated by organized society. Our

Constitution promises that the "natural right to life" of all persons will be protected. Mo.Const. art. I, § 2.

The ultimate question is: May that protection be effected by the imposition of capital punishment? The arguments which swirl about us as to the validity of suggested justifications for the imposition of death as punishment (e. g., retribution and deterrence) make for fascinating reading but miss the mark. *See* S. Donnelly, *A Theory of Justice, Judicial Methodology, and the Constitutionality of Capital Punishment: Rawls, Dworkin, and a Theory of Criminal Responsibility*, 29 Syracuse L.Rev. 1109 (1978); and R. Gardner, *Capital Punishment: The Philosophers and the Court*, 29 Syracuse L.Rev. 1175 (1978).

However, it is my personal belief that an organized society that takes a life for a life as a part of its public policy is mistaken in its belief that it is promoting its own basic premise "that all government * * * is instituted solely for the good of the whole." Mo.Const. art. I, § 1.

Although I am compelled to concur, it is my view that taking the life of a human being "willfully, knowingly, deliberately, and with premeditation" (albeit "lawfully") *by an organized society* is socially amoral. I think it will be self-destructive and that inevitably it will lower the quality of society and will be detrimental, if not devastating, to "the good of the whole." In warfare a fragile line sometimes exists between amoral killing and killing regarded as moral by world society. Here I think the line is not fragile but plain. Establishment of a studied public policy by which a whole community intentionally crosses the line into what I view as amoral killing, even though legal, represents a risk too great to itself for that community to assume.

In my view, banishment for fifty years (§ 565.008, RSMo 1978), with no concern for the probable fiction of rehabilitation, is an acceptable alternative. It would effectually excise the transgressor from our society without debilitating our society's collective concept of decency.

However, I have no authority to impose such views on the people of Missouri. To borrow from Mr. Justice Frankfurter: "As a member of this Court I am not justified in writing my private notions of policy into the Constitution, no matter how deeply I may cherish them or how mischievous I may deem their disregard." *West Virginia State Board of Education v. Barnette*, 319 U.S. 624, 647, 63 S.Ct. 1178, 1189, 87 L.Ed. 1628 (1943) (Frankfurter, J., dissenting).

I have spoken of the death penalty in terms of *public policy*. It should be noted that constitutional concerns must be addressed by this Court, under authority of § 565.014, RSMo 1978, in each case where death is imposed as punishment.

I concur.

BARDGETT, Chief Justice, dissenting.

I dissent and concur in the dissenting opinion of Seiler, J. However, I wish to address the nature of our new capital-murder statute because I believe it differs in a substantive way from former murder statutes which permitted the death penalty as one of the punishments and thereby calls for different treatment by this Court.

Capital murder is not treated as two offenses. Nor do I think the dissent of Seiler, J., suggests that it is two offenses.

The old first-degree-murder statute, § 559.010, RSMo 1969, repealed Laws of Mo.1975, p. 408, § A (hereinafter "old capital murder law") provided:

559.010. Murder in the first degree

Every murder which shall be committed by means of poison, or by lying in wait, or by *any* other *kind of willful, deliberate and premeditated killing,* and every homicide which shall be committed in the perpetration or attempt to perpetrate any arson, rape, robbery, burglary or mayhem, *shall be deemed murder in the first degree.* (Emphasis added.)

The punishment was to be arrived at and assessed in accordance with § 559.030,

RSMo 1969, repealed Laws of Mo.1975, p. 408, § A, which provided:

> 559.030. Trials for murder, verdict and punishment
>
> Upon the trial of an indictment for murder in the first degree, the jury must inquire, and by their verdict ascertain, under the instructions of the court, whether the defendant be guilty of murder in the first or second degree; and *persons convicted of murder in the first degree shall suffer death, or be punished by imprisonment in the penitentiary during their natural lives*; those convicted of murder in the second degree shall be punished by imprisonment in the penitentiary not less than ten years. (Emphasis added.)

The new capital-murder statute essentially copied the mental elements of the old capital-murder law, italicized supra, and designated the offense "capital murder" as follows:

> 565.001. Capital murder defined. Any person who unlawfully, willfully, knowingly, deliberately, and with premeditation kills or causes the killing of another human being is guilty of the offense of capital murder. (L.1977 H.B. 90 § 1). Effective 5–26–77.[1]

Elaborate procedures now appear in our laws whenever the death penalty is a possible punishment. §§ 565.006, 565.008, 565.-012, 565.014, 565.016, RSMo.1978. The penalty section itself is § 565.008.1, RSMo 1978, and provides:

> 565.008. Death penalty, when imposed—life imprisonment, when imposed—minimum of fifty years to be served, when—first and second degree murder, penalties for 1. Persons convicted of the offense of capital murder shall, if the judge or jury so recommends after complying with the provisions of sections 565.006 and 565.012, be punished by death. If the judge or jury does not recommend the imposition of the death penalty on a finding of guilty of capital murder, the convicted person shall be punished by imprisonment by the division of corrections during his natural life and shall not be eligible for probation or parole until he has served a minimum of fifty years of his sentence.

One must carefully read the numerous provisions relating to the procedures and required findings provided in the cited statutes to fully appreciate the qualitative difference between our old capital-murder law and the present one. The differences are pointed up however by the case of *State v. Tiedt*, 360 Mo. 594, 229 S.W.2d 582 (banc 1950), a death-penalty case under our old law, when it is compared with the specific requirements of §§ 565.012.4 and 565.012.5, RSMo 1978.

In *Tiedt*, a jury found Tiedt guilty of "old" first-degree murder and assessed punishment at death. The only other penalty available was life imprisonment, § 559.030, *supra*, repealed. On appeal the defendant contended the trial court erred in refusing a certain instruction he tendered which would have told the jury that " ' . . . the law relative to the right to receive the benefit of the doubt as to the severity of punishment'; that, if defendant was guilty of murder in the first degree, 'he was entitled to the benefit of a reasonable doubt * * as to whether he should be given the death penalty or given a life sentence'; and that the 'same benefit of reasonable doubt should apply in fixing punishment as well as in determining whether any punishment should be assessed.' " *Id.*, 229 S.W.2d 585–6.

This Court held at 586, of 229 S.W.2d: "The instruction was properly refused. If, under the evidence and instructions of the court, the jury found defendant guilty of murder in the first degree, it was for the jury to fix the punishment. *The matter of*

---

1. That part of repealed § 559.010, referring to homicides committed in the course of certain felonies "felony murder", became first-degree murder, § 565.003, RSMo 1978, punishable by life imprisonment, § 565.008.2, RSMo 1978.

*punishment, within the limits fixed by the statute, was solely within the discretion of the jury under all of the facts and circumstances in evidence.* Secs. 4378, 4092, R.S. 1939, Mo.R.S.A.; *State v. Bevins,* 328 Mo. 1046, 43 S.W.2d 432, 434; *State v. Creighton,* 330 Mo. 1176, 52 S.W.2d 556, 563; *Ex parte Dusenberry,* 97 Mo. 504, 11 S.W. 217. *No question of reasonable doubt was involved in the matter of assessing the punishment. People v. Krauser,* 315 Ill. 485, 146 N.E. 593, 605." (Emphasis added.)

The concept set forth in *Tiedt* that the death penalty could be validly imposed without any standards or directions was again approved in *State v. Coleman,* 460 S.W.2d 719 (Mo. banc 1970). But it was precisely this "unbridled discretion" which caused the Supreme Court of the United States to declare this procedure unconstitutional in *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). For a more detailed discussion of what was required by *Furman* and its progeny, see *State v. Duren,* 547 S.W.2d 476 (Mo. banc 1977), where this Court held unconstitutional a mandatory death penalty for capital murder.

The Missouri General Assembly subsequently adopted the present law. The essential and substantive difference is that, at least where the death penalty is a possibility, the jury first decides whether the defendant is guilty or not guilty of capital murder. Of course the state has the burden of proof and the defendant has the benefit of reasonable doubt. If the defendant is found guilty of capital murder, then the second stage of the trial takes place. Sec. 565.006, RSMo 1978. This is completely new in our criminal jurisprudence. Sections 565.012.4 and 565.012.5, RSMo 1978, require that before a death penalty can be assessed the jury must again be properly instructed, must find *beyond a reasonable doubt* that at least one of the statutory aggravating circumstances exist, and must designate its finding in writing.

As pointed out in the dissent of Seiler, J., the instructions make it clear that the law requires that aggravating circumstances must be based on evidence and *that the burden of proof is upon the state to prove the same beyond a reasonable doubt.* MAI–CR 2d 15.40 and MAI–CR 2d 15.42.

The law requires affirmative findings beyond a reasonable doubt stated in a special verdict form before a death penalty can be imposed by the jury. The death penalty cannot result from a negative finding. The effect of our capital-murder law is that capital murder, *without more,* is punishable by life imprisonment without parole for fifty years. Capital murder *plus* an additional verdict of aggravating circumstances authorizes but even then does not compel the death penalty.

In view of the manner in which the legislature has dealt with the punishment for capital murder, which requires a separate finding and verdict by the jury if the death penalty is to be imposed, and because this is a new and unique procedure, we ought not try to fit this into any traditional molds of lesser-included offenses or degrees of homicide. The legislature has already done that by making significant and substantive differences in the penalty section of the capital-murder statutes. They have treated the death penalty as a punishment which is unique unto itself and not comparable to any term of imprisonment.

Under our capital-murder statutes, the crime may be punished by death if, and only if, the state carries its burden of proving beyond a reasonable doubt an element which is not necessarily part of the definition of capital murder. The jury does not decide this additional element when determining whether the defendant is guilty of capital murder. That additional element is the presence of a "statutory aggravating circumstance" which the jury may consider only *after* it finds the defendant guilty of capital murder and then only in those cases where the death penalty is sought. Thus what we have in Missouri is (1) capital murder punishable only by life imprisonment without parole for fifty years, and (2)

capital murder plus at least one aggravating circumstance which may be but is not required to be punishable by death.

In this case the jury has already acquitted the defendant of whatever was necessary to impose the death sentence. This was done in a separate trial or hearing devoted only to that matter and in which the state had the burden of proof and the defendant had the benefit of reasonable doubt. Although it does not fit nicely into traditional concepts, it is clear that the jury has acquitted on the death penalty and the defendant is therefore not subject to retrial on that issue.

In short, the new capital-murder statutes allow a defendant to be placed in jeopardy of conviction of capital murder and then, *after* conviction, allow a defendant to be placed in additional and separate jeopardy of the death penalty. And this defendant, after being placed in such additional and separate jeopardy of being put to death, was acquitted of that death penalty.

I therefore dissent and would quash the preliminary rule in prohibition.

SEILER, Judge, dissenting.

I respectfully dissent. The case at bar presents a defendant who was convicted of capital murder in a bifurcated trial wherein the jury first decides his guilt and, after finding him guilty, in a second stage decides whether the death sentence will be imposed. In this second stage, pursuant to statute, the state presented evidence of aggravating circumstances and the defendant presented evidence of mitigating circumstances for the jury's consideration in determining whether to impose the death sentence. The jury determined a single issue, whether the facts marshalled by the state affirmatively justified the imposition of the death sentence on Robert Bullington.[1] The jury found against the state, deciding that none of the possibilities presented warranted the death sentence. The state now demands that it again be permitted to present the same facts to a second jury with the hope that the new jury will decide to execute the defendant. Three times during his oral argument before this court, the prosecuting attorney conceded that the state would offer the same evidence in support of its demand that Robert Bullington be sentenced to death.[2] The principal opinion will permit the state to relitigate a jury's determination that the death sentence is inappropriate whenever a defendant sentenced to life imprisonment succeeds in overturning an unconstitutional capital conviction.

The principal opinion does not distinguish the very different cases presented by single stage trials and the bifurcated trial re-

---

1. The Missouri Approved Criminal Instruction submitted to the jury for this finding, MAI–CR 15.40 "Guilty of Capital Murder: Statutory Aggravating Circumstance—Finding Required for Death Penalty," with the two aggravating circumstances proffered by the prosecuting attorney would have read as follows:

"In determining the punishment to be assessed (under Count ____) against the defendant for the murder of [*name of victim*], you must first unanimously determine

"Whether the defendant has a substantial history of serious assaultive convictions.

"Whether the murder of [*name of victim*] involved torture or depravity of mind and that as a result thereof it was outrageously or wantonly vile, horrible, or inhuman.

"You are further instructed that the burden rests upon the state to prove beyond a reasonable doubt at least one of the foregoing circumstances, and that it is an aggravating

circumstance. The defendant is not required to prove or disprove anything.

"Therefore, if you do not unanimously find from the evidence beyond a reasonable doubt that at least one of the foregoing circumstances exists and that it is an aggravating circumstance, you must return a verdict fixing the punishment of the defendant at imprisonment for life by the Division of Corrections without eligibility for probation or parole until he has served a minimum of fifty years of his sentence."

2. The statement in the principal opinion that it is speculative as to what the state's evidence on aggravation will be on retrial is contradicted by the statements of the prosecuting attorney who will again try the case for the state. There is no reason why we should doubt the prosecutor's knowledge of his case.

quired for the imposition of the death penalty. By not distinguishing the cases, the analysis overlooks the unanimous authority denying the state a second jury determination as to the death penalty once a jury singularly and affirmatively finds that the defendant is not to be put to death. The cases cited as authority in the principal opinion go back more than fifty years, long prior to establishment of present day standards and requirements which make a death penalty case unique. There has never been anything like it before. The cases relied on by the principal opinion all involve single stage proceedings and do not encompass or address in any respect the issues and complexity presented by the two separate trial stages required by the more recent United States Supreme Court cases for conviction *and* sentencing of the capital murder offense. The only cases directly in point, not all of which are discussed by the principal opinion, reach an opposite result.

I

In 1976, the United States Supreme Court upheld the constitutionality of Georgia's bifurcated trial procedure for capital offenses in *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). In a companion case, *Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976), the Supreme Court held unconstitutional North Carolina's mandatory death penalty statute for first-degree murder. In *Woodson*, the plurality opinion stated that the Constitution requires "particularized consideration of relevant aspects of the character and record of each convicted defendant before the imposition upon him of a sentence of death." 428 U.S. at 303, 96 S.Ct. at 2991.

In 1977, the Missouri legislature enacted a bifurcated trial procedure for capital offenses, now §§ 565.008 and 565.012, RSMo 1978, patterned on the Georgia statute upheld in *Gregg*. The Georgia statute, Ga. Code §§ 27–2503 and 27–2534.1 (1975), provides for a trial in two stages, one for a determination of guilt, and a second for a determination as to whether the degree of the convicted defendant's guilt justifies his execution. Under both statutes, a jury that convicts a defendant of capital murder in the first stage must then in the second stage hear new evidence and determine whether the defendant's guilt will be punished by a life sentence or whether his guilt is such that he should be put to death.

In the instant case, the principal opinion apparently finds that this determination by the jury in the second stage of trial is merely assigning punishment within the range provided by statute and not a finding of what is required to justify the death penalty. But in *Woodson*, the Supreme Court rejected this view: "[T]he penalty of death is qualitatively different from a sentence of imprisonment, however long. *Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two.*" 428 U.S. at 305, 96 S.Ct. at 2991 (emphasis added).

The principal opinion makes much of the fact that there is but one crime of capital murder and refuses to acknowledge that the statutory framework treats capital murder markedly different than any other crime. It is true that § 565.001, RSMo 1978, defines capital murder. But taken alone it is incomplete. Without a penalty being prescribed, it is no more than an abstract declaration of law. A killing may be unlawful, willful, knowing, deliberate and premeditated, yet that is not all capital murder encompasses. In addition to guilt, there must also be found by the jury, beyond a reasonable doubt, aggravating circumstances which the jury must designate in writing in its verdict. Capital murder is meaningless without the punishment. There is no such thing as a conviction of capital murder per se without more. It has to be either capital murder with death or capital murder with life imprisonment, without probation for fifty years, etc. This does not "rend" the crime of capital murder. Rather, it recognizes what we all know to be the fact.

The statutes dealing with the crime provide for a unique two stage proceeding and require that the jury must affirmatively find beyond a reasonable doubt additional aggravating circumstances before it can impose the death penalty. By requiring that the additional element of aggravating circumstances be proven beyond a reasonable doubt for the imposition of the death penalty, the statutory framework effectively establishes the crime of aggravated capital murder punishable by death and the crime of capital murder punishable by life imprisonment without the possibility of probation or parole for fifty years. The legislature had no choice but to enact two degrees of punishment for the crime of capital murder. Had the legislature separated the degrees into two separate offenses, with one of a higher degree punishable only by death, the statute would have been unconstitutional under *Woodson* as a mandatory death penalty statute.

Accordingly, this case presents much more than the potential for enhanced punishment upon retrial under a single-verdict procedure. The issue in this case is whether, under the bifurcated trial procedure for capital cases, the state can ignore the jury's implicit acquittal of the defendant of what is required to justify imposition of the death penalty and on retrial once again ask a jury to find what it considered and declined to find in the first trial.[3]

The principal opinion would smudge the question of what issue the jury decided in the first trial when it gave defendant life imprisonment instead of death. The principal opinion speculates that perhaps the jury "intuitively" found the mitigating circumstances outweighed the aggravating circumstances or that perhaps the jury's "predilections as to mercy" explain the verdict or that perhaps it was in response to "a defendant's plea for mercy rather than finding no aggravation." There is no way we can know what may have subjectively impelled the jury to reject death and agree on life imprisonment. What we do know is that the jury has resolved the issue under instructions which, as pointed out below, presented it with a single, narrow issue for decision. The only "single rationally conceivable issue in dispute before the jury", *Ashe v. Swenson*, 397 U.S. 436, 445, 90 S.Ct. 1189, 1195, 25 L.Ed.2d 469 (1969), after guilt was decided, was whether this defendant was to receive death or life imprisonment under the terms and conditions of the instructions given.

MAI–CR 15.30 instructs the jury that "at this stage of the trial it will be your duty to determine within the limits prescribed by law the punishment which must be imposed for the offense."

MAI–CR 15.32 instructs the jury it is to go to the jury room, "deliberate and arrive at your verdict fixing the punishment to be imposed upon the defendant."

MAI–CR 15.36 instructs the jury "it is your duty and yours alone to decide upon the punishment to be imposed upon the defendant . . . ."

MAI–CR 15.40 concludes by instructing the jury, "Therefore, if you do not unanimously find from the evidence beyond a reasonable doubt that the foregoing circumstance exists and that it is an aggravating

---

3. Even a cursory glance at the Missouri Approved Criminal Instructions for the second stage in capital murder trials, after a jury has already convicted the defendant, indicates that a jury determination to impose a life sentence is an implied acquittal of the aggravated capital murder which would justify the imposition of the death penalty. The "Supplemental Notes on Use Applicable to the 15.00 Series of MAI–CR" (for homicides committed after May 25, 1977) requires the reading of: MAI–CR 15.30, 15.32 and 15.34 in the opening of the second stage before the presentation of evidence; MAI–CR 15.36 after the presentation of evidence and before argument; and, MAI–CR 15.-38, 15.40, 15.42, 15.44, 15.46 and 15.48 after argument. Finally, a special verdict form, MAI–CR 15.56.2, is presented to the jury for its determination of the question.

circumstance,[4] you must return a verdict fixing the punishment of the defendant at imprisonment for life  . . ."

The same is true with respect to MAI–CR 15.42, which requires a verdict of life imprisonment if the jury does not find the aggravating circumstances are sufficient to warrant death.

MAI–CR 15.44 requires the jury to return a verdict of life imprisonment if the mitigating circumstances outweigh the aggravating circumstances.

Finally, MAI–CR 15.46 tells the jury that even if the mitigating circumstances do not outweigh the aggravating circumstances, the jury is not compelled to arrive at a death verdict.

Therefore, the verdict of life imprisonment in the first trial had to mean one of four things:

1. The jury did not find aggravating circumstances, or

2. It did not find the aggravating circumstances were sufficient to warrant death, or

3. The mitigating circumstances outweighed the aggravating circumstances, or

4. Even if they did not, the aggravating circumstances were not sufficient.

To use the language of *Ashe, supra,* this jury, under the instructions, could not have grounded its verdict as to life or death upon an issue other than that which the defendant seeks to foreclose from consideration— namely, that under the facts presented by the state, which the prosecution says will be the same on retrial, none of the possibilities warranting the death sentence existed.

This case raises squarely the issues of the rule of collateral estoppel embodied in the fifth amendment guarantee against double jeopardy as enunciated in *Ashe v. Swenson, supra.* In *Ashe,* the Supreme Court held

that the applicability of the rule in criminal cases " 'must be set in a practical frame and viewed with an eye to all the circumstances of the proceedings.' " 397 U.S. at 444, 90 S.Ct. at 1194 (citing *Sealfron v. United States,* 332 U.S. 575, 579, 68 S.Ct. 237, 239, 92 L.Ed. 180). Viewed with an eye to all the circumstances of the proceedings, the case at bar presents a prior jury determination of "the single rationally conceivable issue in dispute", whether the defendant's guilt was such as to justify the death penalty. *See Ashe, Id.,* 397 U.S. at 445, 90 S.Ct. at 1195. Because the jury in the second stage of the trial found that the aggravating circumstances were either not present or were insufficient, the state should not be given a second chance to present the question to another jury.

## II

Three state supreme courts have addressed the precise issue before this court, each of which held impermissible the state's attempt to relitigate at a second trial whether the convicted defendant's guilt justified the death penalty after the first jury decided the death penalty was not justified. *Ward v. State,* 239 Ga. 205, 236 S.E.2d 365 (1977); *Commonwealth v. Littlejohn,* 433 Pa. 336, 250 A.2d 811 (1969); *People v. Henderson,* 60 Cal.2d 482, 35 Cal.Rptr. 77, 386 P.2d 677 (1963).

In *Ward v. State, supra,* the Georgia Supreme Court found the imposition of the death penalty in the second trial unlawfully disproportionate to the life sentence imposed by the first jury. The court found the disparity in sentences impermissibly disproportionate under Ga.Code § 27–2537(c)(3) (1975), which is word for word the same language contained in Missouri's statute providing standards for review of death penalty cases, § 565.014.3(3), RSMo 1978, as well as under the United States Supreme Court's standards in *Gregg v.*

---

4. The instruction can be reworded slightly to cover the situation where there are several aggravating circumstances submitted, at least one of which must be found.

*Georgia, supra.*[5] The Georgia court concluded:

> "The same defendant was tried previously on the same charges and the jury imposed a life sentence. Therefore the death sentence in the case under review is obviously disproportionate to the life sentence previously imposed against the same defendant in the same case. Accordingly, the law requires us to vacate the death sentence and direct the imposition of a life sentence. . . . To do otherwise would be incongruous and contrary to the clear mandate of the law. For as was said by the United States Supreme Court in *Gregg*, '[t]he provision for appellate review in the Georgia capital-sentencing system serves as a check against the random or arbitrary imposition of the death penalty. In particular, the proportionality review substantially eliminates the possibility that a person will be sentenced to die by action of an aberrant jury.' *Gregg*, supra, 428 U.S. at 206, 96 S.Ct. at 2940."

236 S.E.2d at 368. Because the Georgia and Missouri statutes providing standards for review of death penalty cases are almost identical, this case is certainly persuasive authority for denying the state on retrial a second chance to litigate its demand that the defendant be put to death once the first jury decides the issue against the state.

In the case at bar, the principal opinion attempts to distinguish the *Ward* case "in that the evidence had been presented at the subsequent proceeding and that evidence 'was essentially the same' as that presented at the first trial where the jury did not recommend a sentence of death." But as noted above, the prosecuting attorney in this case conceded during oral argument that the state's evidence in a second trial would be the same as that presented at the first trial. The principal opinion also says that the fact the "notice" required by

§ 565.006–2 as given in the instant case contains the same general averments of aggravation as the earlier notice should not be held to foreclose additional proof within the scope of the notice. But that is not defendant's contention. The prosecuting attorney, himself, has told us that the state's evidence in the second trial will be the same as that presented at the first trial. It is not a matter of what the scope of the notice allows. The fact is that the prosecutor, who is in a better position to know than we are, has conceded the evidence will be the same. This makes the cases virtually identical and the result reached in *Ward* all the more persuasive.

In *Commonwealth v. Littlejohn, supra,* the Pennsylvania Supreme Court held that the constitutional provisions relating to due process, equal protection and double jeopardy precluded the Commonwealth from seeking the death penalty in a second bifurcated trial against a defendant sentenced to life imprisonment in the first trial. The court found that exposing a defendant who appeals from a life sentence to a second possibility of receiving the death sentence at a new trial violates due process by conditioning the right of appeal.

> "The prisoner must decide whether to abandon his constitutional right to a fair trial and serve out his prison term under an invalid or unchallenged sentence, or exercise his statutory right to appeal in order to achieve his constitutional right to a fair trial, at the risk that his second trial might result in the imposition of the death penalty. This makes the price of appeal from an erroneous judgment in a first degree murder case the risk of a man's life. . . ."

250 A.2d at 813–14. The court found that "this choice not only shocks the conscience and offends our sense of justice, but also rises to an unconstitutional condition" under *United States v. Jackson*, 390 U.S. 570,

---

5. In *Gregg v. Georgia*, 428 U.S. 153, 187, 96 S.Ct. 2909, 2931, 49 L.Ed.2d 859 (1976), the Supreme Court held, among other things, that the imposition of the death penalty cannot be disproportionate in relation to the crime for which it is imposed.

88 S.Ct. 1209, 20 L.Ed.2d 138 (1968).[6] *Id.* 250 A.2d at 814.

The Pennsylvania court also found a violation of equal protection on the ground that of all defendants sentenced to life imprisonment, only those who appealed their sentences would be singled out for the possible imposition of the death penalty:

"It is our view that the equal protection clause of the fourteenth amendment also prohibits the Commonwealth from imposing the threat of the death penalty on those who have been convicted of first degree murder and sentenced to life imprisonment. . . . [I]nstead of choosing a group for sentence review on the basis of some factor which bears a rational connection with the purpose of review, this system employs a completely irrational standard for choosing those whose sentences may be changed.

"Further, . . . if the Commonwealth's purpose is to eliminate frivolous appeals, employing the deterrent of an increased sentence does not represent a rational standard. . . . The device of the threat of the death penalty does not bear *any* reasonable relation to the frivolousness or merits of the appeal."

250 A.2d at 815.

In *Littlejohn*, the Pennsylvania court also found a violation of the double jeopardy clause under the principle enunciated in *Green v. United States*, 355 U.S. 184, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957). In *Green*, the United States Supreme Court held that a defendant, who had been convicted of second degree murder and successfully had that conviction reversed, could not be tried again for first degree murder. The court reasoned that the first jury, by returning a verdict of second degree murder, had impliedly acquitted the defendant of the first degree charge. In applying *Green* to the bifurcated trial and circumstances presented in *Littlejohn* (the circumstances presented this court in the case at bar), the Pennsylvania Supreme Court held that the double jeopardy clause prevented a prosecution for the higher punishment, namely, death rather than imprisonment, once the defendant has been convicted of and received the less severe punishment. *Id.*, 250 A.2d at 816.

In *People v. Henderson, supra*, the California Supreme Court held that in a bifurcated trial the prohibition against double jeopardy precluded the imposition of a death sentence upon a defendant after the reversal of the first judgment sentencing him to life imprisonment. Mr. Justice Traynor, writing for the court, reasoned that since *Green v. United States, supra*, established that a reversed conviction of a lesser degree of a crime precludes conviction of a higher degree on retrial, "[i]t is immaterial to the basic purpose of the constitutional provision against double jeopardy whether the legislature divides a crime into different punishments or allows the court or jury to fix different punishments for the same crime." 35 Cal.Rptr. at 86, 386 P.2d at 686. The California court also found that the death penalty threat imposed unreasonable conditions on the right to appeal:

"A defendant's right to appeal from an erroneous judgment is unreasonably impaired when he is required to risk his life to invoke that right. Since the state has no interest in preserving erroneous judgments, it has no interest in foreclosing appeals therefrom by imposing unreasonable conditions on the right to appeal." *Id.*

The principal opinion does not discuss the *Littlejohn* and *Henderson* cases.

In the case at bar, the principal opinion relies on *Gully v. Kunzman*, 592 F.2d 283

**6.** In *United States v. Jackson*, 390 U.S. 570, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968), the Supreme Court held invalid as an unconstitutional condition a provision in the Federal Kidnapping Act, 18 U.S.C. § 1201(a), which provided that a defendant who chose to be tried by a jury was subject to the death penalty, but a defendant who waived his right to a jury trial gained immunity from the death sentence.

(6th Cir.) *cert. denied,* 442 U.S. 924, 99 S.Ct. 2850, 61 L.Ed.2d 292 (1979) as authority for its statement that the fifth amendment does not forbid imposition of the death penalty on retrial of defendant for an offense upon which he was originally sentenced to life. But the *Gully* decision did *not* involve a bifurcated trial with a second stage for determining whether the degree of guilt justified the death penalty:

> "The new death penalty statute was not employed at petitioner's first trial. Indeed, *the option of sentencing petitioners to death was not even submitted to the sentencing authority at the trial.* Accordingly, the fact that petitioners received only a life sentence after the first trial cannot be interpreted as 'an implicit acquittal' of the 'greater' offense created by the new death penalty law. *See Green v. United States,* 355 U.S. 184, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957)."

592 F.2d at 289 (emphasis added). Because *Gully* did not involve a specific jury finding that the defendant's degree of guilt did not justify the imposition of the death penalty, the *Gully* case is clearly distinguishable.[7] In fact, the *Gully* case actually supports the view that, in a bifurcated trial, the imposition of a life sentence by the jury in the second stage is for the purposes of double jeopardy analysis an implied acquittal of aggravated capital murder punishable by death:

> "We do not think this analysis far-fetched, since, under the new scheme, a defendant convicted of a capital offense may not be sentenced to death except upon a finding, 'beyond a reasonable

doubt,' of certain statutorily-prescribed 'aggravating factors.' These 'factors' might be conceived of as elements of the 'greater' crimes of 'capital murder/armed robbery' rather than simply as guides for the exercise of the sentencing authority's discretion to fix an approximate punishment for one convicted of 'simple' willful murder and armed robbery."

*Id.* In any event, *Gully* is not authority for permitting the state to expose the defendant to the risk of the death penalty after a jury has implicitly acquitted him of guilt justifying the imposition of the death sentence.

As the review of the *Ward, Littlejohn, Henderson* and *Gully* cases indicates, the case at bar presents questions of due process, equal protection, and double jeopardy. I am convinced that the second exposure of this defendant to the potential of the imposition of the death penalty, after a jury in the second stage of a bifurcated trial singularly and affirmatively decided that the defendant is not to be put to death would violate the fifth and fourteenth amendments of the United States Constitution, the due process clause of the Missouri Constitution, art. I, § 10, and § 565.014.3(3), RSMo 1978.

### III

The result reached in the principal opinion infringes upon both the right to appeal and the right to a jury trial. Moreover, this result is fundamentally unfair where, as here, the necessity of the second trial is caused by the state's errors.

### A

The Bill of Rights portion of the Missouri Constitution provides in art. I, § 14 "That ·

---

**7.** For the same reason, the principal opinion places undue reliance on *Stroud v. United States,* 251 U.S. 15, 40 S.Ct. 50, 64 L.Ed. 103 (1919) and *Chaffin v. Stynchcombe,* 412 U.S. 17, 93 S.Ct. 1977, 36 L.Ed.2d 714 (1973) (a robbery conviction that did not involve the imposition of the death penalty, both cases involving only single stage trials).

The principal opinion contends that *Chaffin,* despite the fact it involved only a single stage trial, nevertheless supports the proposition that the state may again seek the death penalty

when defendant is tried before the second jury in the case before us, pointing out that *Chaffin* said that "bifurcation alone would not wipe away the fundamental differences between jury and judicial sentencing."

There was no bifurcated trial in *Chaffin* and the *Chaffin* opinion does not purport to deal with the problems which are raised by the instant case, tried as it was under our system of instructions which focus the jury upon a single issue in the second stage proceedings, as discussed earlier herein.

the courts of justice shall be open to every person and certain remedy afforded for every injury to person . . ." This section has been interpreted by this court "to protect citizens in enforcing rights recognized by law, without discrimination." *Schulte v. Missionaries of LaSalette Corporation*, 352 S.W.2d 636, 641 (Mo.1961). In the case at bar, the defendant was originally convicted unconstitutionally and he succeeded in overturning his conviction. His right to a fair trial had been denied him. The principal opinion effectively holds that this defendant, and others similarly spared the death sentence by a jury in the second stage of a capital trial, must forfeit the jury's implied acquittal of the death penalty in order to challenge an unconstitutional conviction. This result obviously discriminates against persons who attempt to enforce their rights to be free from unconstitutional convictions. This discrimination and infringement upon the right of appeal, by forcing a person unconstitutionally convicted to risk the imposition of the death sentence in order to vindicate his rights, violates Mo.Const. art. I, § 14.

B

Aside from infringing the right of appeal, the result reached under the principal opinion will chill the exercise of defendant's right to a jury determination in the second stage of trial. This result will arise when the defendant is forced to choose whether he will exercise his right to a jury trial or settle for sentencing by the trial judge to avoid the possible imposition of the death penalty upon retrial.

In *North Carolina v. Pearce*, 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969), the United States Supreme Court held that when a defendant has succeeded in obtaining a new trial, the due process clause prevents a sentencing judge from imposing a harsher sentence on the defendant if he is convicted in the second trial, absent any identifiable misconduct by the defendant between the time of the first and second trial. The Supreme Court held:

"Due process of law, then, requires that vindictiveness against a defendant for having successfully attacked his first conviction must play no part in the sentence he receives after a new trial. And since the fear of such vindictiveness may unconstitutionally deter a defendant's exercise of the right to appeal or collaterally attack his first conviction, due process also requires that a defendant be freed of apprehension of such a retaliatory motivation on the part of the sentencing judge.

"In order to assure the absence of such a motivation, we have concluded that whenever a judge imposes a more severe sentence upon a defendant after a new trial, the reasons for his doing so must affirmatively appear. Those reasons must be based upon objective information concerning identifiable conduct on the part of the defendant occurring after the time of the original sentencing proceeding. And the factual data upon which the increased sentence is based must be made part of the record, so that the constitutional legitimacy of the increased sentence may be fully reviewed on appeal."

395 U.S. at 725–26, 89 S.Ct. at 2080–2081.

The general sentencing provisions of the new criminal code permit a defendant to request "in writing that the court assess the punishment in case of a finding of guilt" by the jury. § 557.036.2, RSMo 1978. If the defendant waives jury sentencing and, therefore, is sentenced instead by the judge in the event of a finding of guilt, the judge will be bound by the holding of *North Carolina v. Pearce, supra*. Accordingly, a defendant given life imprisonment by the jury after a capital conviction may, if he succeeds in obtaining a new trial, limit the maximum sentence in the second trial to

life imprisonment by waiving jury sentencing in the second trial.[8]

As a result of the holding in the principal opinion, a defendant who obtains a new trial after being sentenced to life imprisonment in a bifurcated capital murder trial will be forced, in the second trial, to waive his right to jury trial guaranteed under the sixth amendment, *Duncan v. Louisiana*, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968), the Missouri Constitution, art. I, § 22(a), to avoid putting his life in jeopardy once again. Only if the defendant waives his right to a jury determination in the second stage of trial can he avoid being forced to run the gauntlet until the state succeeds in its efforts to take his life. Consequently, the result reached today erects the same framework impairing the right to a jury trial which was held unconstitutional in *United States v. Jackson, supra.*

In *Jackson*, the United States Supreme Court held unconstitutional the provision in the Federal Kidnapping Act, 18 U.S.C. § 1201(a), which provided that a defendant who chose to be tried by jury was subject to the death penalty, but a defendant who waived his right to a jury trial gained immunity from the death penalty. Like the defendant in *Jackson*, the defendant in the case at bar is subject to the death penalty if he chooses to be tried by jury in the second stage of trial, but gains immunity from the death penalty if he waives his right to jury sentencing. As in the unconstitutional framework in *Jackson*, under today's decision the defendant, if "ingenuous enough to seek a jury acquittal stands forewarned that, if the jury finds him guilty and does not wish to spare his life, he will die." 390 U.S. at 581, 88 S.Ct. at 1216. But the Supreme Court found this result "needlessly chill[s] the exercise of basic constitutional rights." *Id.* at 582, 88 S.Ct. at 1216.

### C

There is another consideration, too. It is basically unfair to permit the state, after it has failed to obtain a death sentence, and after a new trial has been awarded because of the state's errors, to keep trying the defendant over and over for the death penalty. Even where his life is at stake, the defendant cannot match the resources of the state and sooner or later the state will prevail.

### IV

The principal opinion contends that if the first jury's decision on punishment binds any later jury, "the argument could be made that if the first jury decided on death as an appropriate sentence the second jury's consideration would be limited to only that punishment." While there may be surface appeal in this proposition, the argument ignores long-standing constitutional principles. In *United States v. Ball*, 163 U.S. 662, 671, 16 S.Ct. 1192, 1195, 41 L.Ed. 300 (1896), the United States Supreme Court unequivocally stated that a "verdict of acquittal was final, and could not be reviewed, on error or otherwise, without putting [the defendant] twice in jeopardy, and thereby violating the Constitution." And in *Green v. United States, supra,* the Supreme Court made clear that an implied verdict of acquittal of a greater offense, as when the jury convicts the defendant of a lesser offense, enjoys the same finality and insulation from review as an outright acquittal. In the case at bar, the court is presented with the jury's implied acquittal of capital murder with the death penalty, as the jury refused to find in the second stage of trial that the state's proffered aggravating circumstances justified putting the defendant to death.

The Missouri capital murder statutes require that the jury pass on whether defendant is to be found guilty of capital murder with the death penalty or capital murder with life imprisonment without eligibility for probation or parole for fifty years. Once the issue is decided in the defendant's

---

**8.** This strategy forces the defendant to run the risk, however, that if the jury in the second trial finds the defendant guilty of a non-capital offense, the judge may impose a harsher sentence than the jury would have imposed on him.

favor, whether by an outright acquittal as in *United States v. Ball, supra*, or by an implied acquittal as in *Green v. United States, supra*, the dispute as to the question is ended "then and there." *See United States v. Jorn*, 400 U.S. 470, 484, 91 S.Ct. 547, 556, 27 L.Ed.2d 543 (1971). "[T]here is no exception permitting retrial once the defendant has been acquitted, no matter how 'egregiously erroneous,' . . . the legal rulings leading to that judgment might be." *Sanabria v. United States*, 437 U.S. 54, 75, 98 S.Ct. 2170, 2184, 57 L.Ed.2d 43 (1978). In *Green*, the Supreme Court flatly rejected the government's contention that the defendant "must be willing to barter his constitutional protection against a second prosecution for an offense punishable by death as the price of a successful appeal from an erroneous conviction of another offense for which he has been sentenced . . ." 355 U.S. at 193–94, 78 S.Ct. at 226–227.

In any event, it would not be sound for the court to decide the actual issues presented in this case on the basis of speculation as to the result we would reach in a hypothetical case. The principal opinion has postulated a nonexistent contingency—that of a case where defendant was given death—different from the facts before us, the legal questions of which nonexistent case have neither been briefed nor argued. If this anticipated issue were to arise, this court may decide the case after the issue is timely briefed and argued. I would decide the question when it arises; it is not an issue in this case.

### V

Although the principal opinion states at the outset that the "principal question for our determination is whether on retrial the death penalty . . . is barred as possible punishment by constitutional or statuto-

ry considerations"[9] and concludes that the trial court would be exceeding its authority in denying the state leave to seek imposition of the death penalty on retrial and hence prohibition lies, the opinion also addresses the constitutionality of the death penalty. That point is not raised in relator's original brief in any way. Counsel for respondent in his brief predicts that the death penalty will in due course be held unconstitutional, but that they will "say no more here than enough to make the point, in order to preserve it for appeal" (obviously referring to the appeal which may come after the retrial of the capital murder case), and then argues that § 565.012.2(7), RSMo 1978, one of the statutory aggravating circumstances proffered by the state in its effort to impose the death penalty on defendant, is unduly broad and vague. Relator, then, in his reply brief "suggests that the instant proceeding is not the proper time to consider this particular issue. Whether the statute is overly broad can be better determined when the Court has a case on appeal with a full transcript of the proceedings to assist it." Neither side purports to have briefed or argued these last two constitutional questions thoroughly or adequately.

The present action is in prohibition and once the question of whether the trial judge will exceed his jurisdiction if he goes through with his intention to sustain defendant's motion to strike is determined, the prohibition action is settled. Clearly respondent is not contemplating making that order for the reason he considers the death penalty unconstitutional, because he permitted the death penalty issue to be tried in the first trial. Respondent is contemplating making the order for the reason that defendant was subjected to the death penalty in the first trial, but the jury rejected it, and hence defendant cannot be subjected to it again in the second trial, respondent believes. To go further and

---

9. It is important to bear in mind that the constitutional issue referred to is not the constitutionality of the death penalty, but whether it is constitutional to subject defendant to the death penalty on retrial after the jury in the first trial had rejected the death penalty and given the defendant life imprisonment.

reach out to decide the constitutionality of the death penalty under art. I, § 21 of the Missouri Constitution is to violate our long established rule that we abstain from passing on constitutional questions which are unnecessary to a disposition of the case. See the many cases so holding collected in 7 West's Missouri Digest, *Constitutional* Law, ☞46(1).

I would await a case where the death penalty is squarely before us on direct appeal, with adequate briefing and argument, to pass on its constitutionality. We should not casually foreclose a question of this magnitude.

Additionally, the questions of whether the statutory aggravating circumstances are unconstitutional as unduly broad and vague, and whether the death penalty would be unconstitutional as cruel and unusual punishment if applied to this defendant are questions not ripe for adjudication, as this defendant has yet to stand trial, and we do not know what the outcome of the second trial may be. Defendant may not receive the death penalty in a second trial, even if the present case goes against him, nor do we know what evidence defendant may offer as to the cruel and unusual aspects of the death penalty. These are all questions properly addressed on appeal. "[P]rohibition cannot be substituted for an appeal." *State ex rel. Vogel v. Campbell*, 505 S.W.2d 54, 58 (Mo. banc 1974). I would quash the preliminary rule.